# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2022-NMCA-026

Filing Date: June 9, 2020

No. A-1-CA-36925

STATE OF NEW MEXICO ex rel.
FRANK C. FOY, JOHN CASEY, and
SUZANNE FOY,

  Qui Tam Plaintiffs-Appellants,

v.

VANDERBILT CAPITAL ADVISORS, LLC;
VANDERBILT FINANCIAL, LLC;
VANDERBILT FINANCIAL TRUST;
OSBERT M. HOOD; RON D. KESSINGER;
ROBERT P. NAULT; JAMES R. STERN;
PATRICK A. LIVNEY; STEPHEN C.
BERNHARDT; KURT W. FLORIAN, JR.;
ANTHONY J. KOENIG, JR.; MARK E.
BRADLEY; PIONEER INVESTMENT
MANAGEMENT U.S.A., INC.; PIONEER
GLOBAL ASSET MANAGEMENT S.P.A.;
UNICREDIT S.P.A.; KATTEN MUCHIN
ROSENMAN LLP; RICHARDS, LAYTON &
FINGER, P.A.; CLIFFORD PRICE
WATERHOUSE COOPERS; BRUCE MALOTT;
MEYNERS + CO; MARLA WOOD; GARY
BLAND; SUSAN O. BLAND; CITIGROUP;
CITIGROUP GLOBAL MARKETS INC.;
BEAR, STERNS & CO. INC.; JP MORGAN
SECURITIES, INC.; UBS INVESTMENT
BANK; UBS SECURITIES LLC; CALYON
SECURITIES (USA), INC.; CALYON
CREDIT AGRICOLE CIB; CREDIT
AGRICOLE SA; JEFFERIES CAPITAL
MANAGEMENT, INC.; FORTIS
SECURITIES LLC; FORTIS NV; ACA
MANAGEMENT, L.L.C.; ABN AMRO,
INC.; STONECASTLE SECURITIES, L.L.C.;
NEPC; ALLAN C. MARTIN; MERRILL
LYNCH & CO., INC.; LINDA CONTARINO;

**CLAUDIA CORRERA; GAETANA CORRERA; JOHN DOE #1; DAVID CONTARINO (JOHN DOE #2); MARC CORRERA (JOHN DOE #3); ANTHONY CORRERA (JOHN DOE #4); and JOHN DOE #5 THROUGH #100,**

Defendants-Appellees,

and

**AUSTIN CAPITAL MANAGEMENT, LTD; AUSTIN CAPITAL MANAGEMENT GP CORP.; CHARLES W. RILEY; BRENT A. MARTIN; DAVID E. FRIEDMAN; WILL JASON ROTTINGER; VICTORY CAPITAL MANAGEMENT, INC.; KEYCORP; BEREAN CAPITAL; DUDLEY BROWN; TREMONT PARTNERS, INC.; TREMONT CAPITAL MANAGEMENT, INC.; TREMONT GROUP HOLDINGS, INC.; OPPENHEIMER FUNDS, INC.; GARY BLAND; DAVID CONTARINO; BRUCE MALOTT; MEYNERS COMPANY; MARC CORRERA; ANTHONY CORRERA; SANDIA ASSET MANAGEMENT; ALFRED JACKSON; DAVIS HAMILTON AND JACKSON; GUY RIORDAN; JUNIPER CAPITAL; ILEEN KOTECKI; DAN HEVESI; HENRY "HANK" MORRIS; JULIO RAMIREZ; PAUL CROSS; CROSSCORE MANAGEMENT; SDN INVESTORS; PSILOS GROUP; ALBERT WAXMAN; JEFFREY KRAUSS; STEPHEN KRUPA; DAVID EICHLER; DARLENE COLLINS; WETHERLY CAPITAL GROUP; DAN WEINSTEIN; VICKY SCHIFF; QUADRANGLE ROUP; ALDUS EQUITY; SAUL MEYER; MERCELLUS TAYLOR; MATTHEW O'REILLY; RICHARD ELLMAN; DEUTSCHE BANK; DIAMOND EDGE CAPITAL; MARVIN ROSEN; CARLYLE MEZZANINE PARTNERS; CARLYLE GROUP; DB INVESTMENT MANAGERS; TOPIARY TRUST; PARK HILL GROUP; DAN PRENDERGAST; CATTERTON PARTNERS; BLACKSTONE GROUP; GOLD BRIDGE CAPITAL; DARIUS ANDERSON; KIRK**

**ANDERSON; ARES MANAGEMENT; INROADS GROUP; CAMDEN PARTNERS; HFV; BARRETT WISSMAN; TAG; AJAX INVESTMENTS; CAYTON DUBILIER AND RICE; INTERMEDIA; LEO HINDERY; WILLIAM R. HOWELL; CABRERA CAPITAL; MARTIN CABRERA; CRESTILNE INVESTORS; JOHN DOE #1; AND JOHN DOE #3 THROUGH #50,**

Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Louis P. McDonald, District Judge**

Certiorari Denied, October 9, 2020, No. S-1-SC-38413. Released for Publication June 21, 2022.

Victor R. Marshall & Associates, P.C.
Victor R. Marshall
Albuquerque, NM

for Appellants

Hector H. Balderas, Attorney General
Joseph M. Dworak, Assistant Attorney General
Santa Fe, NM
Angelica Anaya Allen, Assistant Attorney General
Brian L. Moore, Assistant Attorney General
Albuquerque, NM

for State of New Mexico

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Andrew G. Schultz
Albuquerque, NM

Fried, Frank, Harris, Shriver & Jacobson LLRP
Peter L. Simmons
New York, NY

for Vanderbilt Appellees

Madison Harbour & Mroz, P.A.
William C. Madison
Albuquerque, NM

for Appellee Livney

Esquivel & Howington, LLC
Martin R. Esquivel
Albuquerque, NM

for Appellee Malott

FallickLaw, Ltd.
Gregg Vance Fallick
Albuquerque, NM

for Appellees Malott and Wood

Holland & Hart LLP
Mark F. Sheridan
Julia Broggi
Santa Fe, NM

Paul Weiss Rifkind Wharton & Garrison, LLP
Richard A. Rosen
New York, NY

for Appellees Citigroup Inc.; Citigroup Global Markets Inc.; Bear, Stearns & Co., Inc.; JP Morgan Securities Inc.; and ABN AMRO Inc.

Budagher & Associates
John A. Budagher III
Albuquerque, NM

Reed Smith LLP
Jordan W. Siev
New York, NY
Andrew C. Bernasconi
Washington, DC

for Appellee Calyon Securities (USA) Inc. n/k/a Credit Agricole Securities (USA) Inc.

Keleher & McLeod, P.A.
W. Spencer Reid
David W. Peterson
Albuquerque, NM

for Appellee ACA Management, LLC

Miller Stratvert, P.A.
Kirk R. Allen
Albuquerque, NM

Morvillo Abramowitz Grand Iason & Anello P.C.
Edward M. Spiro
Richard D. Weinberg
New York, NY

for Appellee Merrill Lynch & Co., Inc.

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Brian K. Nichols
Albuquerque, NM

Proskauer Rose LLP
Dietrich L. Snell
New York, NY

for Appellees Ares Management, Collins, Eichler, Krauss, Krupa, Psilos Group, and
Waxman

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
John R. Cooney
R.E. Thompson
Albuquerque, NM

Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP
Richard A. Sauber
Washington, DC

for Appellee Quadrangle Group LLC

Michael W. Brennan, P.A.
Michael W. Brennan
Santa Fe, NM

for Appellees Blackstone Group, Park Hill Group, and Prendergast

Maldegen, Templeman & Indall LLP
Jon J. Indall
Santa Fe, NM

for Appellees Intermedia and Hindery

Butt Thornton & Baehr PC
Rodney L. Schlagel
Albuquerque, NM

for Appellee Howell

Keleher & McLeod, P.A.
Sean Olivas
Albuquerque, NM

for Appellees Cabrera Capital and Cabrera

**OPINION**

**BUSTAMANTE, Judge Pro Tempore.**

**{1}**     A long and winding road has led these cases to our door. Following eight years of litigation at the trial and appellate levels, the district court entered a judgment that dismissed the Qui Tam Plaintiffs' Fraud Against Taxpayers Act (FATA) claims in their entirety. The judgment also approved a settlement negotiated by the Attorney General's Office (AGO) with certain—but not all—defendants. Raising a plethora of issues, Qui Tam Plaintiffs appeal. We affirm.

## I.     Background and Procedural Posture

**{2}**     These two now-consolidated actions were among the first actions filed in New Mexico under the auspices of FATA, NMSA 1978, §§ 44-9-1 to -14 (2007, as amended through 2015). FATA allows private persons to "bring a civil action for a violation of Section 44-9-3 . . . on behalf of the person and the state or political subdivision." Section 44-9-5(A). Cases brought by private parties in like circumstances are commonly known as "qui tam actions." *State ex rel. Foy v. Austin Capital Mgmt., Ltd.* (*Austin II*), 2015-NMSC-025, ¶ 3, 355 P.3d 1. And the private persons bringing the actions are generally referred to as qui tam plaintiffs. The qui tam plaintiffs who initiated these actions are Frank C. Foy, Suzanne Foy, and John Casey. We will refer to them as "Qui Tam Plaintiffs."

**{3}**     Litigation under FATA has produced five reported opinions, including two involving the case we decide today. *Austin II*, 2015-NMSC-025, ¶ 1 (holding that FATA's retroactive effect does not violate the *Ex Post Facto* clauses of the United States and New Mexico Constitutions); *State ex rel. Foy v. Oppenheimer & Co.*, 2019-NMCA-045, ¶¶ 3, 23, 447 P.3d 1159 (affirming dismissal of qui tam action pursuant to Section 44-9-9(D)); *N.M. State Inv. Council v. Weinstein*, 2016-NMCA-069, ¶ 2, 382 P.3d 923 (affirming approval of settlements over the qui tam plaintiffs' objections); *State ex rel. Peterson v. Aramark Corr. Servs., LLC*, 2014-NMCA-036, ¶ 3, 321 P.3d 128 (concluding that issue and claim preclusion concepts did not bar the action); *State ex rel. Foy v. Austin Capital Mgmt., Ltd.* (*Austin I*), 2013-NMCA-043, 297 P.3d 357, *aff'd in part,*

*reversed in part by Austin II*, 2015-NMSC-025. The opinions in these cases do not directly resolve all the issues presented to us here, but they do provide useful history and context to our discussion. *Weinstein* is particularly apropos.

## A.      Pre-Consolidation Procedures

**{4}**      Qui Tam Plaintiffs Frank and Suzanne Foy filed their first FATA complaint in July 2008. *See State ex rel. Foy v. Vanderbilt Capital Advisors, LLC* (*Vanderbilt*), D-101-CV-2008-1895. The *Vanderbilt* complaint focused on investments made in 2006 by the State Investment Council (SIC) and the New Mexico Educational Retirement Board (ERB) in collateralized debt obligations (CDOs). The complaint alleged that Defendants made numerous false and misleading claims and representations concerning the nature and quality of the investments, the risks involved, and relationship between Defendants. Defendants included apparently all of the individuals, financial institutions, accounting firms, and legal services firms involved in creating, financing, and marketing the CDO instruments.

**{5}**      In accordance with Section 44-9-5(B), the complaint was filed under seal. Following some delay, the AGO filed the State's "Notice of Election to Decline Intervention" in December 2008. *See* § 44-9-6(F). That filing allowed the complaint to be unsealed and for litigation to proceed.

**{6}**      Qui Tam Plaintiffs filed their second FATA action in April 2009. *See State ex rel. Foy v. Austin Capital Mgmt., Ltd.* (*Austin*), No. D-101-CV-2009-01189. The initial complaint focused on losses suffered in investments made through Austin in the now-infamous funds operated by Bernie Madoff, asserting that those investments—and others—were made as a result of political influence exerted by the executive branch. Less than two months later Qui Tam Plaintiffs filed a first amended complaint adding more than fifty new Defendants and more detailed allegations of "pay-to-play" wrongdoing involving payment of undisclosed and improper third-party placement fees to Mark Correra. The file does not reveal an election not to intervene by the AGO, but the AGO did sign a joint motion to unseal the complaint. The order granting the joint motion makes clear that the AGO did not intend to be actively involved in the case, at least not initially. The two cases were assigned to different district court judges.

**{7}**      Consisting primarily of discovery skirmishes, challenges to jurisdiction, and a short-lived removal to federal court, little of what ensued the next four years is particularly pertinent to the issues before us. Four items do stand out, however.

**{8}**      First, the *Vanderbilt* district court judge—Judge Stephen Pfeffer— dismissed all claims that accrued prior to the effective date of FATA on ex post facto grounds. The district court in *Austin*—Judge John Pope—later adopted the reasoning and analysis of Judge Pfeffer's ruling. Judge Pope's ruling ultimately led to our Supreme Court's ruling in *Austin II* that FATA does not violate ex post facto limitations. 2015-NMSC-025, ¶ 1. As of October 2011, litigation in the *Austin* case was stayed while the case was on appeal, with the exception that the district court was allowed to rule on the AGO's

pending motion for partial dismissal of the "pay-to-play" allegations in the FATA complaint. The district court never ruled on the motion.

**{9}**      Second, in June 2011, Qui Tam Plaintiffs filed identical motions in both cases to disqualify Attorney General Gary King and Day Pitney—the law firm the SIC had hired to pursue recovery efforts with regard to "pay-to-play" improprieties in its investments— from representing the SIC. The motion asserted that Attorney General King's political ties to Governor Richardson's administration prevented him from participating in the case. The motion also alleged that a number of assistant attorneys general had personal ties to the administration that precluded them from working on the case. And the motion asserted that the State Investment Officer and the vice-chair of the SIC were complicit in the pay-to-play activities alleged in the first amended complaint. With regard to Day Pitney, the motion asserted that it had represented the Trustee of the New York Common Fund in its efforts to recover money from Austin and thus Day Pitney necessarily had divided loyalties. The motion also argued that Day Pitney had a conflict because most of its revenue came from representing "Wall Street" firms in securities case, and that this was influencing how it was conducting the litigation—all to the detriment of the SIC. Qui Tam Plaintiffs attached numerous exhibits to the motion, including a March 2011 letter Mr. Victor Marshall sent to Governor Susana Martinez explaining Qui Tam Plaintiffs' position concerning the conflicts as they perceived them.

**{10}**    The district court in *Vanderbilt* denied the motion on the ground that Qui Tam Plaintiffs lacked standing to raise the conflict of interest issue. The district court in *Austin* never ruled on the motion.

**{11}**    Third, in May 2011, the AGO filed motions in *Vanderbilt* and *Austin* seeking dismissal of those portions of the qui tam complaints that relied on allegations of pay-to-play and improper use of third-party marketers in connection with SIC investments. The motions attached edited versions of the qui tam complaints reflecting the AGO's request. The *Vanderbilt* court granted the motion in December 2011. The *Austin* court never entered an order on the motion.

**{12}**    Fourth, in February 2013, the AGO, on behalf of the State, filed a motion asking the district court to approve a settlement it had negotiated on behalf of the SIC and the ERB. The settlement was part of the AGO's alternative remedy plan that specifically addressed the CDO investments the SIC and ERB had made through the Vanderbilt entities. The AGO's alternative plan was summarized in *Weinstein* and need not be repeated here. 2016-NMCA-069, ¶¶ 11-14. A copy of the signed settlement agreement (Settlement Agreement) was attached to the motion. It is the same document and agreement before us now, seven years later. The $24.25 million payment called for in the Settlement Agreement remains in escrow to this date.

**{13}**    The district court denied the AGO's motion, expressing concern about the propriety and feasibility of assessing the fairness, adequacy, and reasonableness of the settlement at that point. The court noted, for example, that our Supreme Court's decision on the constitutionality of FATA's retroactive provisions might affect the

accuracy of the parties' assessment of Defendants' exposure. In addition, the court expressed concern about whether it could assess the settlement in the absence of more formal discovery by the parties. Also, the court was concerned that the AGO had over-reached by asking that Qui Tam Plaintiffs not be allowed to challenge the settlement and not be allowed to request an award, attorney fees, or expenses.

**{14}**    In the same order, the district court stayed all proceedings in the case until such time as our Supreme Court decided the ex post facto issues. The case lay fallow until August 2015 when our Supreme Court mandated the matter back to the district court, entered an order consolidating the *Vanderbilt* and *Austin* proceedings and designated Judge McDonald to preside over both cases.

**{15}**    We highlight these aspects of the pre-consolidation history of the cases to demonstrate that the primary issues we will deal with have been present and have been dealt with repeatedly—in this litigation and in other cases. The contentiousness of the relationship between Qui Tam Plaintiffs and the AGO is notable and unfortunate.

**B.    Post-Consolidation Litigation**

**{16}**    The first substantive activity in the case after mandate issued was Qui Tam Plaintiffs' request for a status conference to address a number of items, including service of process issues, a new complaint Qui Tam Plaintiffs intended to file, discovery matters, and "[e]nforcement of Judge Pfeffer's Order of July 13, 2013" denying the AGO's first motion to approve the Settlement Agreement. Qui Tam Plaintiffs filed their motion to amend the complaint before the requested status conference was held. The proposed "Amended, Supplemented and Consolidated Complaint" added sixty-three new Defendants, included new assertions of false and misleading statements about the investments, and made new assertions of conspiracies among Defendants.

**{17}**    On the same day—and in explicit response to Qui Tam Plaintiffs' request—the AGO filed its status report. The AGO explained its alternative enforcement efforts to date and laid out its litigation strategy for the cases, including reviving its request for approval of the Settlement Agreement and seeking complete dismissal of Qui Tam Plaintiffs' complaints. The AGO also sought "to clarify the role of the State vis a vis Qui Tam Plaintiffs" in the litigation, urging that FATA did "not displace the predominating authority of the New Mexico Attorney General to represent the interests of the State[.]"

**{18}**    At the October 2015 status conference, the district court decided that it would be more efficient to hear and decide the AGO's motions to dismiss and to approve the Settlement Agreement before it dealt with the request to amend the complaints.

**{19}**    In accordance with the district court's order, the AGO filed its motion to dismiss first, arguing—in part—that "the State, which is the real party in interest, has created its own enforcement plan and elected, pursuant to FATA Section 44-9-6(H), to seek alternate remedies to FATA." The motion also asked that the district court hold "that the settlements approved by Judge Singleton in *The New Mexico State Investment Council*

*v. Gary Bland*, *et. al*., No. D-101-[C]V-2011-01534 . . . have a preclusive effect on . . . Qui Tam Plaintiffs' FATA claims related to pay-to-play at the SIC." This motion framed the course of the litigation through the evidentiary hearing held in April 2016.

**{20}**  In tenacious pursuit of their argument that SIC's enforcement counsel Day Pitney had fatal conflicts of interest, Qui Tam Plaintiffs filed a separate FATA suit against the law firm, accusing it of wide-ranging nefarious conduct. *See State ex rel. Foy v. Day Pitney LLP, et. al*., No. D-101-CV-2015-02049. Qui Tam Plaintiffs filed a copy of the complaint in these cases as a "related proceeding." The filing gave rise to heated motion practice, but it is not clear what ultimately came of the filing. The complaint was not introduced or used at the hearing. The primary case was stayed in July 2016 and continues to be inactive.

**{21}**  Highlighting their focus on disqualifying Day Pitney as a litigation strategy, Qui Tam Plaintiffs in January 2016 filed a "Motion to Give No Effect to Day Pitney Settlements." The motion relied on the FATA suit against Day Pitney, but also attached case captions from electronic searches showing that Day Pitney had in the past represented some of the "Wall Street" Defendants in the case, including Citigroup, JP Morgan, Deutsche Bank, Ernst & Young, Merrill Lynch, and Bank of America. None of the cases involved SIC or ERB recovery efforts. This motion led to another round of briefing by the AGO, Vanderbilt, and other settling Defendants.

**{22}**  Finally, Qui Tam Plaintiffs requested leave to submit "Limited Discovery Concerning Day Pitney Conflicts" on Day Pitney. The district court allowed Qui Tam Plaintiffs to serve six interrogatories on two Day Pitney attorneys. Qui Tam Plaintiffs served the interrogatories on March 17 and the attorneys responded on April 13—nine days before the evidentiary hearing on the AGO's motions.

**{23}**  The district court provided the parties three and a half days of trial time starting April 25, 2016. The parties submitted their requested findings of facts and conclusions of law by the end of July 2016. The district court entered its findings and conclusions ten months later and its final judgment on September 5, 2017. Qui Tam Plaintiffs timely appealed.

## II.     Issues and Appellate Review Standards

**{24}**  As a preliminary matter, we address certain aspects of Qui Tam Plaintiffs' briefing in order to provide context to our decisional process.

**{25}**  First, Qui Tam Plaintiffs' brief in chief (BIC) asserts that the appeal presents only questions of law subject to de novo review "[b]ecause the district court dismissed this case without discovery and without a trial[.]" Qui Tam Plaintiffs apparently do not think the three-and-one-half-day evidentiary hearing they participated in qualifies as a "trial." They are mistaken. We will apply the appropriate standard of review to the issues Qui Tam Plaintiffs have properly preserved and argued.

**{26}** Second, Qui Tam Plaintiffs' approach to briefing carries consequences with regard to our review of the case. For example, in keeping with their theory that the appeal presents only legal issues, the BIC does not include any specific attack on, or even any point of disagreement with, any of the district court's findings of fact. Instead the BIC asserts a blanket "challenge [to] all of the district court's findings and conclusions." This approach is improper, ineffective, and contrary to the Rules of Appellate Procedure. *See* Rule 12-318(A)(4) NMRA (requiring a "specific attack on any finding, or the finding shall be deemed conclusive").

**{27}** Rule 12-318(A)(4) also requires "with respect to each issue presented . . . citations to authorities, record proper, transcript of proceedings, or exhibits relied on." The BIC includes very few citations to the record proper, transcript of the hearing, or the exhibits admitted. This by itself is problematic for our review in that it would require us to search a large record proper (some 16,000 pages) on our own for pertinent material. This we are not required to do. Presentation of an organized, lucid argument is Qui Tam Plaintiffs' burden, and they cannot foist it on this Court. "This [C]ourt will not search the record to find evidence to support an appellant's claims." *In re Estate of Heeter*, 1992-NMCA-032, ¶ 15, 113 N.M. 691, 831 P.2d 990.

**{28}** In addition, the BIC utterly fails to include a summary of the "substance of the evidence bearing on [a] proposition[.]" Rule 12-318(A)(3). "[A]n appellant is bound by the findings of fact made below unless the appellant properly attacks the findings, and . . . the appellant remains bound if he or she fails to properly set forth all the evidence bearing upon the findings." *Martinez v. Sw. Landfills, Inc.*, 1993-NMCA-020, ¶ 18, 115 N.M. 181, 848 P.2d 1108 (citing *Maloof v. San Juan Cty. Valuation Protest Bd.*, 1992-NMCA-127, ¶ 19, 114 N.M. 755, 845 P.2d 849). To the extent the BIC cites material from the record, it discusses only those aspects which tend to support its position. This is not in keeping with the letter or spirit of the Rules of Appellate Procedure. As a result, we will not address any issues that are subject to the substantial evidence standard of review. *See Wachocki v. Bernalillo Cty. Sheriff's Dep't*, 2010-NMCA-021, ¶¶ 15-17, 147 N.M. 720, 228 P.3d 504.

**{29}** Thus, we will not address whether the district court's findings of fact concerning the Settlement Agreement are supported by substantial evidence. Similarly, we will not address the findings of fact supporting the district court's conclusion that dismissal of the FATA claims is appropriate. And, we will not address Qui Tam Plaintiffs' challenge to the findings of fact supporting the district court's conclusion that the Settlement Agreement was appropriately approved and ratified by the SIC and ERB. We will, however, examine any properly preserved legal arguments that affect these issues.

**{30}** Third, we will not address undeveloped and incoherent arguments. Qui Tam Plaintiffs' bald assertion that the district court did not carry out our Supreme Court's mandate in *Austin II* fits that category.

**{31}** Fourth, Qui Tam Plaintiffs complain that the district court refused to enforce a subpoena duces tecum they served in 2009 on an entity called the Moving America

Forward Foundation. Qui Tam Plaintiffs cite to an "Exhibit 16" to show what they expected to get with the subpoena. "Exhibit 16" was not offered or admitted at the hearing and is not part of the record on appeal. The BIC does not cite to the record to demonstrate when enforcement was requested, when the matter was argued, or why the district court denied it. Under these circumstances, we will not address the issue.

{32}    Fifth, Qui Tam Plaintiffs assert that "the [district] court relied on statements by the lawyers in the case." Apart from citation to general case law, the BIC fails to provide any detail about what the "statements" were, how they were made, or how the district court "relied" on them. There is not a single citation to the record. We cannot address this issue.

{33}    Sixth, Qui Tam Plaintiffs argue that it was error for the district court to admit transcripts of depositions conducted by the Securities and Exchange Commission (SEC) as part of its investigation of pay-to-play activities in New Mexico and elsewhere. However, Qui Tam Plaintiffs fail to direct our attention to where in the record they objected to the admission of the transcripts. Absent a timely objection, Qui Tam Plaintiffs did not preserve the issue for appeal. *See Crutchfield v. N.M. Dep't of Taxation & Revenue*, 2005-NMCA-022, ¶ 14, 137 N.M. 26, 106 P.3d 1273 ("[O]n appeal, the party must specifically point out where, in the record, the party invoked the court's ruling on the issue. Absent that citation to the record or any obvious preservation, we will not consider the issue."). In any event, the district court was clear that it was admitting the material only to show that the AGO received it in the course of its investigation, and not as substantive evidence. We also note that Qui Tam Plaintiffs offered Anthony Correra's SEC deposition, and it was admitted on the same basis.

{34}    Seventh, in the BIC, Qui Tam Plaintiffs argue that the district court gave "collateral effect to settlements in other cases which were never tried." In addition to not providing any record proper citation, Qui Tam Plaintiffs' assertion ignores the final judgment entered in this case. In paragraph 4 of the final judgment, the district court noted that the State's "motion to determine the preclusive effect, if any, to the previously-approved settlements between . . . [D]efendants other than the Vanderbilt Settling Defendants is now moot[.]"

**Discovery and Evidentiary Rulings**

{35}    Qui Tam Plaintiffs assert that the district court refused to allow them any discovery as to the merits of the case against Defendants or as to the fairness and adequacy of the Settlement Agreement. They also complain that they were not allowed to sufficiently explore Day Pitney's conflicts of interest. Discovery and evidentiary rulings are generally reviewed for abuse of discretion. *See Estate of Romero ex rel. Romero v. City of Santa Fe*, 2006-NMSC-028, ¶ 6, 139 N.M. 671, 137 P.3d 611. We do not normally disturb a discovery ruling unless it "is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153. We may, however, find an abuse of discretion when

a ruling is based on a misapprehension of the law. *N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 7, 127 N.M. 654, 986 P.2d 450.

## A.    Discovery Issues

**{36}**    The BIC is void of any citation to the record reflecting any submitted discovery or any motion to allow discovery as to the merits of the case against Defendants or of the Settlement Agreement. There is one reference in the BIC to the previously mentioned motion for limited discovery concerning Day Pitney conflicts. In that pleading Qui Tam Plaintiffs assert that if evidence is to be heard at the scheduled April hearing, "Foy must be allowed to conduct discovery." Apparently, at least some of these matters were considered during a March 14 status conference because the district court entered an order allowing discovery on two Day Pitney attorneys. The order does not mention any discussion about discovery as to the merits or the settlement. And the record before us does not include a transcript of the March 14 status conference.

**{37}**    Qui Tam Plaintiffs also fail to acknowledge that they were provided or had access to all of the informal discovery the AGO had amassed during its pursuit of its alternative remedy, including the entire (some 5,000,000 pages) SEC investigation, plus all material gathered internally from SIC and ERB files and personnel interviews. The SEC material was provided in October 2012—three and one-half years before the hearing in this case.

**{38}**    Given the state of the briefs and record, we could refuse to deal with the issues per the discussion above. But Qui Tam Plaintiffs make a legal argument that Sections 44-9-5 and -6 of FATA give them a "statutory right to gather and present evidence in opposition to the dismissal of the FATA lawsuit." The BIC is obtuse on this point, but Qui Tam Plaintiffs appear to assert a variation on the argument they made in *Weinstein* that FATA gives them an unfettered right to discovery. The variation makes no difference. Qui Tam Plaintiffs' arguments were made, analyzed, and resolved in *Weinstein. See* 2016-NMCA-069, ¶¶ 41-62. Qui Tam Plaintiffs fail to mention, much less attempt to distinguish *Weinstein*'s discussion of the issue. There is thus no reason to revisit the discussion. We do note, however, that in *Weinstein*, the qui tam plaintiffs at least submitted a discovery request that the district court curtailed. *See id.* ¶ 15. Here, Qui Tam Plaintiffs did not even do that.

**{39}**    Finally, with regard to the discovery served on Day Pitney, Qui Tam Plaintiffs argue that the responses were inadequate and that the district court improperly denied their motion to compel further discovery. Qui Tam Plaintiffs fail to acknowledge that their motion to compel was filed on July 6, 2016—almost three months after the hearing in April was held and completed. The lateness of the motion to compel would be sufficient reason by itself to deny it.

## B.    Refusal to Admit Exhibit 18

**{40}** During the hearing Qui Tam Plaintiffs offered into evidence an audio recording, ostensibly of Saul Meyer—one of the defendants in the cases—talking about the investment atmosphere in New Mexico and making some remarkable assertions about then-Governor Richardson and the Correras. The district court refused to admit the recording primarily because the tape was not authenticated. On appeal, Qui Tam Plaintiffs do not argue that the district court was wrong in its assessment or that the exhibit was admissible under some other rule of evidence. Qui Tam Plaintiffs' only argument is that they could not authenticate the tape because the "court barred any discovery."

**{41}** We have noted above that Qui Tam Plaintiffs did not serve any discovery requests nor move for permission to submit discovery apart from the asserted Day Pitney conflicts of interest. The district court sustained a proper objection to an exhibit. It cannot be faulted for not "allowing" discovery it was not asked to allow.

## C.     Amendment of Qui Tam Plaintiffs' Complaint

**{42}** Qui Tam Plaintiffs argue that the district court "prevented" them from amending their complaints contrary to Rule 1-015(A), (B), and (D) NMRA. Qui Tam Plaintiffs do not cite any order in the record to support their argument. Neither do they cite to any oral rulings denying the motion to amend. The district court acted on the request to amend at a status conference held to determine how the now-consolidated cases would proceed. It was Judge McDonald's first contact with the cases. The conversation started with Qui Tam Plaintiffs alerting the court to their recent motion to amend and their argument as to why it was needed. Various Defendants then suggested that—in accordance with the AGO's stated intent to pursue dismissal of the FATA claims entirely and to get approval of the settlement—it would be more efficient to hear those motions first. If they were granted, there would be no need to consider amending the complaint. After hearing the parties' arguments, the district court decided that the best way to proceed would be to consider the AGO's motions first. The district court set a briefing schedule for the motions and held the motion to amend in abeyance.

**{43}** The district court's order to hold the motion to amend in abeyance is reviewed under the abuse of discretion standard. *See All. Health of Santa Teresa, Inc. v. Nat'l Presto Indus.*, 2007-NMCA-157, ¶ 26, 143 N.M. 133, 173 P.3d 55. We see no abuse of discretion here. The district court chose a plan for the litigation that could avoid the need for amending the complaint. And, in recognition that the plan might not pan out, the district court simply held off ruling on the motion. We will not second-guess the district court's reasonable administration of the case before it. *See id.*

## D.     Authority of the Attorney General to Seek Dismissal of the FATA Claims and Approval of the Settlement Agreement

**{44}** Qui Tam Plaintiffs vaguely argue that the AGO did not have "legal authority" to appear in these cases and represent the State because it elected not to intervene when the cases were first filed and because it never sought to formally intervene thereafter.

We hesitate to address the issue because, once again, Qui Tam Plaintiffs do not provide any references to the record indicating when this matter was brought to the attention of the district court. We have decided to address the matter because it is an important question of law affecting the operation of FATA and because it is likely to arise in the future.

**{45}**   Qui Tam Plaintiffs advanced a version of the argument below in a pleading they called "Consolidated Response to Recent Motions to Dismiss." They did not, however, mention below that the AGO's failure to formally intervene was problematic. That facet of the argument was thus not preserved. *See Woolwine v. Furr's, Inc.*, 1987-NMCA-133, ¶ 20, 106 N.M. 492, 745 P.2d 717 ("To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court."). We will not address it further, except to note that it would have been a mere formality in this case given that the AGO had by then been actively engaged in the case since 2009 when Judge Pfeffer asked it to provide an amicus brief on the issue of FATA's retroactive provisions. The AGO also filed a brief in support of Qui Tam Plaintiffs' motion to reconsider Judge Pfeffer's ex post facto dismissal order. Thus by the time the AGO filed its motion for partial dismissal in May 2011, it had been actively engaged in the case for seventeen months.

**{46}**   Putting the technical issue of intervention aside, the question becomes: may the AGO seek dismissal of a qui tam FATA complaint—and ask the district court to approve alternate-remedy settlements it has negotiated—after it has declined to take over the action pursuant to Section 44-9-5(D)(2)? The answer must be "yes" based on a relatively straightforward reading of FATA combined with the broad statutory powers and duties of the Attorney General.

**{47}**   Interpretation of statutes is, of course, a question of law that we undertake de novo. *State ex rel. Children, Youth & Families Dep't v. Maurice H.* (*In re Grace H.*), 2014-NMSC-034, ¶ 65, 335 P.3d 746. We look first to "the wording of the statute and attempt to apply the plain meaning rule[.]" *United Rentals Nw., Inc. v. Yearout Mech., Inc.*, 2010-NMSC-030, ¶ 9, 148 N.M. 426, 237 P.3d 728 (internal quotation marks and citation omitted). When construing individual statutory sections within a comprehensive act, we "examine the overall structure of the act and consider each section's function within the comprehensive legislative scheme." *Britton v. Office of the Att'y Gen.*, 2019-NMCA-002, ¶ 27, 433 P.3d 320. When the language of the act is not readily susceptible to a plain meaning analysis, we may also "consider the practical implications and the legislative purpose of the statute[.]" *Bishop v. Evangelical Good Samaritan Soc'y*, 2009-NMSC-036, ¶ 11, 146 N.M. 473, 212 P.3d 361; *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352.

**{48}**   Qui Tam Plaintiffs' analysis begins and ends with Section 44-9-5(D). The gist of their argument is that, once the AGO declines to take over the case, qui tam plaintiffs and their counsel become the sole representative of the State's interest. Qui Tam Plaintiffs quote from the first sentence of Section 44-9-6(F) to polish off their argument: "If the state . . . elects not to proceed with the action, the qui tam plaintiff shall have the

right to conduct the action." The upshot of Qui Tam Plaintiffs' analysis is that once in control, they cannot be supplanted.

**{49}** But Qui Tam Plaintiffs improperly ignore the last sentence of Section 44-9-6(F): "When the qui tam plaintiff proceeds with the action, the court, without limiting the status and rights of the qui tam plaintiff, may permit the attorney general or political subdivision to intervene at a later date upon a showing of good cause." Subsection (F) allows the AGO to reengage after initially declining to "take over the action[,]" pursuant to Section 44-9-5(D)(2). *See* § 44-9-6(F).

**{50}** The more interesting question is how the litigation will proceed once the AGO has intervened. Joinder of the AGO results in two parties ostensibly representing the state. Section 44-9-6 is not clear about the relationship between qui tams and the AGO when the AGO intervenes in an ongoing action. Should qui tams continue as the lead party representing the state, or do the parties' roles revert to that described in Section 44-9-6(A) and (D)? These sections contemplate that the AGO will be in control of the litigation. The parties' arguments below and here revolve around this primary question.

**{51}** We conclude that in the context of *this* case, the issue is largely irrelevant because we are not presented with a situation where continued active litigation against Defendants was necessarily in the offing. Rather, the AGO's purpose and objective in getting back in was to end the FATA litigation and get the alternative remedy settlement it had negotiated approved. Section 44-9-6(B) and (C) allow the "State" to proceed exactly as the AGO did here.

**{52}** The source of the AGO's authority to participate actively in a qui tam proceeding once it has reengaged is not a mystery. Qui Tam Plaintiffs argue that because they are the sole representative of the "State," the AGO cannot claim the same mantle unless it relies on some undefined common law power—which the AGO does not have—to act. This argument, again, ignores Section 44-9-6(F) allowing the AGO to intervene. More importantly, Qui Tam Plaintiffs do not explain how or why a decision early in the life of qui tam action not to take over the case negates the AGO's statutory status as the state's legal representative. The Legislature has endowed the AGO with broad powers and burdened it with broad duties. NMSA 1978, Section 8-5-2(A), (B), and (J) (1975) provide:

> Except as otherwise provided by law, the attorney general shall:
>
> A.    prosecute and defend all causes in the [S]upreme [C]ourt and [C]ourt of [A]ppeals in which the state is a party or interested;
>
> B.    prosecute and defend in any other court or tribunal all actions and proceedings, civil or criminal, in which the state may be a party or interested when, in his judgment, the interest of the state requires such action or when requested to do so by the governor;

. . . .

        J.      appear before local, state and federal courts and regulatory officers, agencies and bodies to represent and to be heard on behalf of the state when, in his judgment, the public interest of the state requires such action or when requested to do so by the governor[.]

These sections make clear that the AGO is the state's lawyer. It would be absurd for us to conclude that an election under Section 44-9-5(D) negates these powers and duties. The Legislature simply could not have intended that result.

**E.      The District Court Applied an Appropriate Standard of Proof to Find "Good Cause" for Dismissal of the FATA Complaint**

**{53}**    Section 44-9-6(B) of FATA provides:

The state . . . may seek to dismiss the action for good cause notwithstanding the objections of the qui tam plaintiff if the qui tam plaintiff has been notified of the filing of the motion and the court has provided the qui tam plaintiff with an opportunity to oppose the motion and to present evidence at a hearing.

In its conclusions of law relevant to the AGO's motion, the district court observed that "[i]n jurisdictions that, like New Mexico, have enacted statutes containing a 'good cause' requirement for dismissal of a qui tam action, courts have adopted a highly deferential 'rational basis' standard of review. Under that standard, the [s]tate need only proffer a reason for dismissing the action that is 'rationally related to a valid government purpose.' "

**{54}**    Qui Tam Plaintiffs argue that this deferential rational basis standard is simply incompatible with FATA's requirement of good cause. Unfortunately, they do not provide any analysis beyond juxtaposition of the words.

**{55}**    As the district court recognized, we are not writing on a blank slate. California and Nevada courts have concluded that the "rational basis" standard is appropriate under their false claims acts, both of which require a showing of "good cause" for dismissal of a qui tam action at the behest of the state. *See* Cal. Gov't Code § 12652(e)(2)(A) (West 2013); Nev. Rev. Stat. Ann. § 357.120(2) (West 2015).

**{56}**    California took up the issue first in *Laraway v. Sutro & Co.*, 116 Cal. Rptr. 2d 823 (Cal. Ct. App. 2002). In *Laraway* the qui tam plaintiff filed an action asserting that a contractor and certain employees of a school district were improperly paid for travel expenses because they were not pre-approved. *Id.* at 826. The school district intervened and filed a motion to dismiss. *Id.* The qui tam plaintiff argued that his complaint stated a cause of action and thus there could be no good cause to dismiss it. *Id.* at 828. The trial court disagreed. *Id.* at 826.

**{57}** On appeal, the court noted that good cause was not defined in the statute. *Id.* at 829. "Good cause" is not defined in FATA either. The court observed that the meaning of good cause is of necessity relative and dependent on all circumstances. *Id.* at 830. As such, the meaning of "good cause" in the context of the California False Claims Act (and FATA) requires statutory construction. Because "good cause" is susceptible to more than one reasonable meaning, the plain meaning approach to construction is of no avail. We must resort to other aids, including consideration of the legislative purpose and aim to be achieved, the place of the statute in the scheme of governance, and the actors involved. We should also consider the practical implications various interpretations would have on implementation of the statute. *See id.*; *see also Bishop*, 2009-NMSC-036, ¶ 11.

**{58}** The *Laraway* court suggested that a reasonable place to start was a compendium of what good cause might include in this context; for example, "reasons that are fair, honest, in good faith, not trivial, arbitrary, capricious, or pretextual, and reasonably related to legitimate needs, goals, and purposes." *Laraway*, 116 Cal. Rptr. 2d at 830. The approach commends itself to us.

**{59}** With these considerations in mind, the *Laraway* court first noted that the Ninth Circuit Court of Appeals had adopted a dismissal standard as matter of substantive due process for the Federal False Claims Act even though it does not include a good cause requirement. *Id.*; *U.S. ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998) (holding that the government can dismiss an FCA action for any reason rationally related to legitimate government purpose, and the reason may not be fraudulent, arbitrary, capricious or illegal).

**{60}** Turning to California's legislative history with regard to its false claims statute and the purpose of qui tam statutes in general, the *Laraway* court essentially adopted the Ninth Circuit's approach, holding:

> We conclude good cause for dismissal of a qui tam action on behalf of a political subdivision exists where the dismissal is rationally related to a legitimate government purpose, and not arbitrary, capricious, made in bad faith, based on improper or illegal motives, founded on an inadequate investigation, or pretextual. In exercising its discretion the trial court may consider any matter relevant to the issue, including the relative merits of the action, the interest of the qui tam plaintiff, the purposes underlying the False Claims Act, and the potential waste of government resources.

116 Cal. Rptr. 3d at 831.

**{61}** We adopt the *Laraway* court's formulation. This is not "good cause lite" or "dismissal on demand." Properly applied, the standard will not result in mere rubber-stamping of the AGO's requests for dismissal.

**{62}**     Having established a meaning for good cause under FATA, we now turn to our review of the district court's ruling. The district court's decision is most appropriately reviewed under an abuse of discretion standard. *See id.* at 829. Findings of good cause will require district courts to assess and weigh the factors listed. We have no reason to impose a de novo review in that there would be little if anything to be gained in terms of accuracy of the result by having an appellate court reweigh the evidence. Assessment of such things as bad faith, pretext, motives, and relative merits of case are best done by district courts.

**{63}**     Viewing the district court's ruling through the lens we just adopted, we see no abuse of discretion. As directed by the district court, we read its rulings on the motion to dismiss and approval of the Settlement Agreement together. The unchallenged findings of fact reflect a focus on three areas of inquiry. First, it detailed the AGO's extensive collection efforts taken apart from the FATA claims. These alternative remedies include: (1) *SIC v. Bland*, the source of our opinion in *Weinstein*; (2) *New Mexico Educational Retirement Board v. Renaissance Private Equity Partners, L.P., et. al.*, No. D-101-CV-2010-03598—the district approved the settlements involved in that proceeding, Qui Tam Plaintiffs have appealed those judgments, and the matter is currently pending in this Court as No. A-1-CA-38096; (3) the informal litigation and discovery process that led to the Settlement Agreement in this case; and (4) the AGO's participation in the *Austin Capital* class action.

**{64}**     The AGO's pursuit of alternative remedies has been fruitful. The settlements already approved and those pending review will result in recoveries in the tens of millions of dollars.

**{65}**     In contrast, the district court's findings indicate that the FATA claims are not progressing well, are unwieldy, include inherent proof hurdles, are subject to non-frivolous jurisdictional challenges, and are likely to drag on for many more years because of protracted motion practice and expected appeals. The district court's observations and concerns about the viability and practicality of Qui Tam Plaintiffs' litigation strategy are well-founded. Comparing the relative success of the AGO's alternative remedies with the lack of progress and built-in difficulties with Qui Tam Plaintiffs' efforts is enough to support the district court's decision. The district court could readily conclude that the AGO's request to dismiss is well-founded, in good faith, not pretextual and based on adequate investigation.

**{66}**     Given the strength of the factual record supporting the decision below, there is no reason to rely on the separation of powers concepts urged by the AGO. We leave exploration of that idea for a case with a more suitable record.

## F.     The Terms of the Settlement Agreement Are Not Precluded by FATA

**{67}**     At the last moment, Qui Tam Plaintiffs filed a motion asserting that the attorney fee provision of the Settlement Agreement is precluded by FATA. Filed after they had

filed their notice of appeal to this Court, the motion marked the first time the issue had been raised. The district court denied the motion without elaboration.

**{68}** The Settlement Agreement includes the following provision describing one of the prerequisites to assigning an "Effective Date" to it:

> The court in the *Qui Tam* action shall have entered a judgment . . . (iv) ordering that no money shall be payable by any of the Defendant Released Parties or the Escrow Agent to the *Qui Tam* Action plaintiffs or their attorneys, whether under [FATA], or for any other reason (including the doctrine of *quantum meruit*), and that if such amounts are determined by the court to be due at all, they shall be paid solely by NMSIC, NMERB and/or the State of New Mexico or from the settlement proceeds distributed to them under this Agreement.

The purpose of the provision is obviously to ensure that the settling Defendants' obligation to pay money would be limited to the sums stipulated in the Settlement Agreement.

**{69}** Qui Tam Plaintiffs argue that this provision is contrary to Section 44-9-7(D) and Section 44-9-10 of FATA. Section 44-9-7(D) provides, "Any award to qui tam plaintiff shall be paid out of the proceeds of the action or settlement, if any. The qui tam plaintiff shall also receive an amount for reasonable expenses incurred in the action plus reasonable attorney fees that shall be paid by the defendant." Section 44-9-10 provides, "The state . . . shall not be liable for expenses or fees that a qui tam plaintiff may incur in investigating or bringing an action pursuant to the Fraud Against Taxpayers Act."

**{70}** The gist of Qui Tam Plaintiffs' argument is that their costs and attorney fees cannot be included in or paid from a lump sum fund such as that created in the Settlement Agreement. We disagree.

**{71}** "The meaning of language used in a statute is a question of law that we review de novo." *Cooper v. Chevron U.S.A., Inc.*, 2002-NMSC-020, ¶ 16, 132 N.M. 382, 49 P.3d 61. If the wording of the statute is not "clear and unambiguous" we may look to the history and background of the statute. *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 13, 121 N.M. 764, 918 P.2d 350. We may also consider the practical implications of different interpretations and how they fit with the purpose of the act. *See Bishop*, 2009-NMSC 036, ¶ 11; *Miller v. N.M. Dep't of Transp.*, 1987-NMSC-081, ¶ 8, 106 N.M. 253, 741 P.2d 1374. In short, as Justice Daniels reminded us in *State v. Strauch,* 2015-NMSC-009, ¶ 13, 345 P.3d 317, "[i]n interpreting statutory language . . . , it is necessary to think thoughts and not words."

**{72}** Section 44-9-7(A) addresses how proceeds of a qui tam action may be divided when the state "proceeds with an action brought by a qui tam plaintiff." Section 44-9-7(B) addresses how the proceeds of a qui tam action may be divided when the state declines to participate and allows the qui tam action to take its course without the state's

participation. There is no provision in FATA that specifically addresses how a qui tam plaintiff is to share in funds collected through an alternative remedy by way of a settlement. Section 44-9-6(H) provides, "If an alternative remedy is pursued, the qui tam plaintiff shall have the same rights in such a proceeding as the qui tam plaintiff would have had if the action had continued pursuant to this section." That sentence does not provide any guidance in and of itself since it simply refers parties to the process of litigation and a qui tam plaintiff's right to participate as described in Section 44-9-6.

{73} Section 44-9-7(D) is a general provision. The first sentence of Section 44-9-7(D) unremarkably provides that qui tam plaintiffs shall receive their "award" payment from the "proceeds of the action or settlement." The second sentence creates the right of qui tam plaintiffs to be reimbursed their expenses incurred in the action and to receive "reasonable attorney fees that shall be paid by the defendant." Both sentences reflect the typical concern in qui tam statutes that the public fisc not be responsible to a private person for the cost of pursuing qui tam claims. *See* 31 U.S.C. § 3730(d)(1) (2018) ("Any such person shall also receive an amount for reasonable expenses . . . necessarily incurred, plus reasonable attorney[] fees and costs. All such expenses, fees, and costs shall be awarded against the defendant."); Cal. Gov't Code § 12652(g)(1)(C)(8) ("All expenses, costs, and fees shall be awarded against the defendant and under no circumstances shall they be the responsibility of the state or political subdivision.").

{74} The requirement that a qui tam plaintiff's attorney fees "be paid by the defendant" is beguiling in its simplicity, to paraphrase Justice Montgomery in *State ex rel. Helman*, 1994-NMSC-023, ¶ 23. It seems clear, but there is no intrinsic meaning to the words. It is useful to consider how different interpretations of the phrase "shall be paid" would operate in the real world. Of course, Defendants should pay Qui Tam Plaintiffs' expenses rather than the State. There are different ways that can be accomplished while safeguarding the public fisc, but none of the mechanisms can be said to be mandatory under Section 44-9-7(D).

{75} Qui Tam Plaintiffs' argument (made to the district court—not here) is that attorney fees must be paid "in addition to the amounts recovered by the [S]tate." That formulation would work well if all qui tam cases went to trial and resulted in a verdict. Ancillary procedures to determine fees in that scenario are common.

{76} But requiring such ancillary judicial determinations would not work well in cases resolved by settlement. Settlements are generally structured like the Settlement Agreement before us. That is, the parties arrive at a sum acceptable to them given their view of the case, including their potential exposure, the odds of an unfavorable or favorable outcome at trial, the expense involved in taking a matter to trial, etc. Both parties want to end litigation, but a defendant has a particular desire to end it once and for all at a known cost. Requiring that a potential liability remain open to a litigant can be a marked disincentive to reaching an agreement. We note that New Mexico has a strong public policy of encouraging settlements. *McConal Aviation, Inc. v. Commercial Aviation Ins. Co.*, 1990-NMSC-093, ¶ 20, 110 N.M. 697, 799 P.2d 133 ("We feel compelled to enforce the terms and expectations of the settling parties."); *Bd. of Educ.*

*v. N.M. State Dep't of Pub. Educ.*, 1999-NMCA-156, ¶ 14, 128 N.M. 398, 993 P.2d 112 ("[P]ublic policy encourages, and we have a duty to enforce, settlement agreements.").

**{77}** In the context of a global, lump sum settlement, the question of how the defendant pays a qui tam plaintiff's attorney fees is really a matter of accounting. The state (or the qui tam plaintiff) knows that there will be a claim for qui tam plaintiff's "contingency award" and for attorney fees and costs. The state—or qui tam plaintiff—must take that potential claim against the fund created by the settlement into account as it decides what it is willing to settle for. That determination involves educated guesswork and is no different from any other consideration driving negotiations. If the state assumes, for example, that the qui tam plaintiff's claims are likely to absorb twenty percent of the fund, and it is willing to accept the remaining eighty percent as a reasonable measure of the state's due, all parties' interests have been served. There is no statutory reason to interfere with that process.

**{78}** There is little case law on the issue. Qui Tam Plaintiffs and the AGO cite to none. Defendant Vanderbilt cites two cases that appear to involve lump sum settlements under the federal FCA, but neither delves deeply into the issue raised here. *See Brooks v. Unites States*, 383 F.3d 521, 522, (6th Cir. 2004); *U.S. ex rel. Hullinger v. Hercules, Inc.*, 80 F. Supp. 2d 1234, 1239 (D. Utah 1999).

**{79}** The most relevant case we found is *United States ex rel. Sharma v. University of Southern California*, 217 F.3d 1141 (9th Cir. 2000). There, the qui tam plaintiff pursued his case on his own and eventually reached a settlement of $650,000 total. *Id.* at 1143 n.2. The qui tam plaintiff and the defendant allocated $250,000 to the FCA claim and $400,000 to the non-qui tam retaliation claim. *Id.* The qui tam plaintiff asserted that his thirty percent statutory award should be applied to the total FCA award. *Id.* The United States argued that the FCA portion included the qui tam plaintiff's fees and costs and they could not be considered "proceeds" subject to his contingency claim. *Id.* Rather than disallow the settlement, the district court modified the agreement by applying the statutory rate to a sum calculated by subtracting the fees and costs form the gross FCA allocation. *Id.* at 1142. This modification was sufficient to bring the settlement into compliance with FCA's specific requirement that fees and costs be "awarded against the defendant." *See id*. at 1143, 1145.

**{80}** The approach taken by the court in *Sharma* is not the only way to do the calculation. It does indicate, however, that a lump sum settlement is an acceptable way to resolve a qui tam action in the federal arena. We see no reason why it would not be acceptable under FATA. We leave the details of allocation to the district court in the first instance.

## G.    Day Pitney's Conflicts of Interest Issue

**{81}** It is fair to observe that since our Supreme Court's remand order—and perhaps before—Qui Tam Plaintiffs have focused most of their attention in this litigation on their assertion that Day Pitney has serious conflicts of interest that preclude it from

representing the SIC and that foreclose a finding that the Settlement Agreement was negotiated at arms-length. As noted above, the record reveals numerous efforts to convince the district court of the conflicts, including the separate FATA suit against Day Pitney. In addition, Qui Tam Plaintiffs filed a writ of superintending control with the New Mexico Supreme Court in July 2016, asking it to intervene even before the district issued its rulings.

**{82}** Despite Qui Tam Plaintiffs' efforts, the district court decided that Day Pitney did not have a disqualifying conflict and that the Settlement Agreement was negotiated at arms-length.

**{83}** The district court also decided that Qui Tam Plaintiffs "did not establish that the alleged conflicts prejudice[d] or injure[d] the [Q]ui [T]am [P]laintiffs' rights."

**{84}** As is their practice, Qui Tam Plaintiffs have not challenged any of the district court's findings as not being supported by substantial evidence. "An unchallenged finding of the trial court is binding on appeal." *Seipert v. Johnson*, 2003-NMCA-119, ¶ 26, 134 N.M. 394, 77 P.3d 298; *see* Rule 12-318(A)(4). Qui Tam Plaintiffs' briefing is, however, teeming with hyperbolic assertions of "fact" and descriptions of conspiracies for which there is no support in the record other than their allegations. For purposes of our analysis, we have ignored all such material. To the extent Qui Tam Plaintiffs refer to actual material in the record, they make no attempt to provide a full summary of evidence on any issue. Rather, they invariably cite only material that supports their version of events, contrary to Rule 12-318(A)(3).

**{85}** In its findings of fact related to the motion to dismiss, the district court found:

3. The State of New Mexico, through the New Mexico Attorney General's office (NMAGO) the State Investment Council (SIC), and Educational Retirement Board (ERB), have investigated and pursued claims against various persons and entities through this Fraud Against Taxpayers Act (FATA) action and outside of this action.

. . . .

5. Through the investigation, the SIC issued a request for proposals ("RFP") and retained the law firm of Day Pitney . . . to complete the investigation and, acting as commissioned Special Assistant Attorneys General, to seek recoveries . . .

6. The SIC was told that Day Pitney represented numerous financial institutions in unrelated matters and that Day Pitney could not conduct litigation against its clients. Those clients include Deutsche Bank, Citigroup, Merrill Lynch, Bank of America, JP Morgan and Ernst & Young. The SIC understood and agreed that the State

would be responsible for evaluating potential claims the SIC might have against Day Pitney clients and, if warranted, pursing those claims.

**{86}**  In its findings of fact and conclusions of law related to approval of the Settlement Agreement, the district court found and concluded:

**Findings of Fact**

48.  Day Pitney represented only the SIC, and never represented the ERB, in connection with recovery efforts related to pay-to-play activities.

49.  . . . Day Pitney's expertise in securities cases, including on the defense side, was a strong factor that helped convince the SIC to hire the firm as outside counsel.

50.  The SIC hired Day Pitney with the understanding that it was the responsibility of the State, not Day Pitney, to investigate and pursue claims, if any, against any individual or financial entity Day Pitney had previously represented.

. . . .

69.  Notably, by the time the May 2015 vote was held, Foy and/or his counsel repeatedly had voiced their criticisms of Day Pitney, its performance, and its alleged conflicts of interest in multiple forums, including in written submissions to the SIC, in oral presentations during public comment period at SIC meetings, and at a public meeting of the State Legislature's Investments and Pensions Oversight Committee in 2011.

**Conclusions of Law**

7.  The members of the SIC made an informed decision to approve the Settlement [Agreement] with Vanderbilt. The SIC and ERB ratifications occurred after the [Qui Tam P]laintiffs publicly stated their concerns about alleged conflicts of interest on the SIC's lawyers at the Day Pitney law firm. The members of the SIC and ERB boards were able to consider all that information in determining whether to approve the Vanderbilt Settlement [Agreement].

. . . .

14.  [The district c]ourt is satisfied that the attorneys for both the State and Vanderbilt engaged in arm's length negotiations in reaching the Settlement Agreement.

15. [Qui Tam P]laintiffs did not establish that the alleged conflicts prejudice or injure the [Qui Tam P]laintiffs' rights.

. . .

19. The representation by Day Pitney did not create a conflict of interest, and Day Pitney's work for the NMAGO demonstrated its expertise in this type of matter.

**{87}** The district court thus found that Qui Tam Plaintiffs did not have standing to assert the conflict and that there was simply no conflict. We will focus our analysis on the "no conflict" ruling. The issue of standing is presented more clearly here than in *Weinstein*, 2016-NMCA-069, ¶ 94. We decline to address it, however, because it does not necessarily lead to a definitive resolution of the issue. That is, if we determine that Qui Tam Plaintiffs had standing, we would still have to analyze the conflicts issue on its merits.

**{88}** Rule 16-107(A)(1) and (2) NMRA of New Mexico's Rules of Professional Conduct provide:

Except as provided in Paragraph B of this rule, a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

**{89}** Qui Tam Plaintiffs' original assertion of conflict was that Day Pitney's work included securities defense matters and thus it could not be trusted to represent the SIC effectively against "Wall Street" firms. Qui Tam Plaintiffs' focus sharpened in 2015 when they found eight cases involving Vanderbilt Defendants in which Day Pitney acted as defense counsel. None of the cases were related in any way to New Mexico's pay-to-play claims.

**{90}** Qui Tam Plaintiffs argue that these instances of representation create non-consentable conflicts. They rely heavily on *Roy D. Mercer, LLC v. Reynolds*, 2013-NMSC-002, ¶ 1, 292 P.3d 466. In *Mercer*, our Supreme Court held that "when an attorney has played a substantial role on one side of a law suit and subsequently joins a law firm on the opposing side of that lawsuit, both the lawyer and the new firm are disqualified from any further representation, absent informed consent of the former client." *Id.* ¶ 1 (emphasis omitted). *Mercer* thus involved egregious facts not present

here. And, even with those facts, our Supreme Court held out the possibility that client consent could cure or waive the conflict. *Mercer* does not control the situation before us.

**{91}** More importantly, Qui Tam Plaintiffs ignore the fact that Day Pitney disclosed its relationship with the firms before entering into the contract with the SIC. As a result of the disclosure, the AGO agreed that Day Pitney would not represent the SIC in collection efforts against any of its former or current clients. Decisions concerning proceeding against them—and prosecution of litigation against them—would be handled by in-house AGO attorneys. Day Pitney's work under its contract with the SIC was limited "to the extent Day Pitney is not subject to a conflict of interest with respect a particular qui tam defendant[.]"

**{92}** Limitation of the scope of representation is a recognized method for eliminating conflicts of interest when there is no direct relationship between the representations. *See* Restatement (Third) of the Law Governing Lawyers § 121, cmt. c(iii), illus. 4 (2019); 1 G. Hazard, W. Hoder & P. Jarvis, The Law of Lawyering, § 12.24 (4th ed. 2015 Supp.).

**{93}** Limiting the scope of representation can be effective because it addresses the primary factors Rule 16-107 and Section 121 of Restatement (Third) of the Law Governing Lawyers examine to determine whether a conflict exists and how courts should react to them. Under Rule 16-107(A)(2), there must be a "significant risk" that the representation of one or more clients will be materially limited by the lawyer's responsibilities to others. The primary concern is loyalty, as *Mercer* noted. 2013-NMSC-002, ¶ 1. But, there are also related concerns about improper use or dissemination of confidential information. These concerns can be ameliorated by limiting the scope of the representation as long as the client is informed and consents and the limitation does not unduly interfere with the work the client wants. *See* Restatement (Third) of the Law Governing Lawyers § 19.

**{94}** The district court's unchallenged finding that Day Pitney and the SIC agreed to limit the scope of Day Pitney's work to exclude its other clients supports its conclusion that no conflict existed.

## Conclusion

**{95}** Having found no error, we affirm the judgment.

**{96} IT IS SO ORDERED.**

**MICHAEL D. BUSTAMANTE, Judge Pro Tempore**

**WE CONCUR:**

**JULIE J. VARGAS, Judge**

**BRIANA H. ZAMORA, Judge**