12 P.3d 442

2000-NMSC-031

**STATE of New Mexico,**
**Plaintiff–Appellee,**

v.

**Lawrence NIETO, Defendant–Appellant.**

No. 24,787.

Supreme Court of New Mexico.

Oct. 16, 2000.

Robert E. Tangora, L.L.C., Robert E. Tangora, Santa Fe, NM, for Appellant.

Patricia A. Madrid, Attorney General, Joel Jacobsen, Assistant Attorney General, for Appellee.

## OPINION

FRANCHINI, Justice.

{1} After a jury trial, Lawrence Nieto was found guilty of four counts of felony murder in the first degree, armed robbery with a firearm enhancement, conspiracy to commit murder in the first degree, and tampering with evidence for his involvement in what has come to be known as the Torreón Cabin Murders. On appeal, Defendant asserts: (1) the jury was improperly instructed on the criminal intent necessary to sustain a felony murder conviction; (2) the trial court erred in rejecting Defendant's tendered jury instructions on mistake of fact and duress; (3) the court erroneously refused to suppress his confession on the grounds that Defendant had not received *Miranda* warnings; (4) evidence of Defendant's gang affiliation improperly suggested guilt by association; (5) there was insufficient evidence to support any of his convictions; and (6) the trial court's errors constituted cumulative error.

{2} We hold: (1) the jury was properly instructed on the intent element of felony murder; (2) the trial court properly rejected Defendant's instructions on mistake of fact and duress; (3) the court's refusal to suppress Defendant's confession was proper because the court determined that Defendant's statements were not part of a custodial interrogation; (4) evidence of Defendant's gang affiliation was admissible; (5) there was sufficient evidence to support each conviction; and (6) the trial court did not commit cumulative error. We affirm the convictions.

## FACTS AND PROCEDURE

{3} On April 14, 1996, Ben Anaya Sr. drove to his cabin near Torreón, New Mexi-

co. Mr. Anaya had not seen his son, Ben Anaya Jr., since December 10, 1995, when Ben Jr. had left for the cabin. Upon arriving at the cabin, Mr. Anaya noticed that trash had been strewn across the yard and the security gate, which his son always locked prior to leaving, had been left wide open. Entering the cabin, Mr. Anaya observed more trash and found evidence of a small fire inside. After turning off the television, Mr. Anaya made his way to the bedroom where he discovered the corpse of a person who would later be identified as his son.

{4} Ben Jr. was not the only body found at the cabin. When Torrance County Deputy Sheriff Susan Encinias entered the cabin, she found the body of Cassandra Sedillo laying face up on the floor. One of Cassandra's children was on the floor, buried in clothes and a sleeping bag, while the other child lay on the top bunk of a bunk bed. The bodies were in various states of decomposition and infested, in varying degrees, with insects. According to the testimony of Medical Investigator, Dr. Patricia McFeeley, Ben's death was caused by a gunshot wound to the head. She also testified that two gunshot wounds, one to the left shoulder and another to the head, resulted in Cassandra's death. Cassandra's two young sons, Matthew Garcia and Johnny Ray Garcia, both died as a result of dehydration and starvation. Based on the bodies' respective degrees of decomposition as well as an entomologist's report, Dr. McFeeley concluded that the two adults died on or around December 12, 1995, and the children died sometime in early January 1996.

{5} Lawrence Nieto implicated himself in the murders during three separate statements to police on May 11, May 13, and May 15, 1996. At a suppression hearing, the trial court refused to grant Defendant's motions to suppress each of his statements. The Court concluded that although Defendant did not receive *Miranda* warnings prior to his first statement, such warnings were not required because the statement was not part of a custodial interrogation. The second and third statements were uttered during custodial interrogations, but the court found that Defendant had received *Miranda* warnings

prior to both those statements. Accordingly, the trial court denied Defendant's motion to suppress admission of his statements.

{6} The State charged Defendant with four open counts of murder, aggravated burglary, armed robbery, two counts of tampering with evidence, and conspiracy. At trial in Torrance County, Defendant offered the following account of the night of the murders. He had been at home with his mother when fellow 18th Street gang members Shawn Wilkins and Roy Buckner came over and convinced him to accompany them to the cabin in Torreón. Defendant rode in the backseat of the car. In the front seat, Mr. Wilkins kept a gun on his lap and revealed that the purpose of the trip would be to kill another gang member, Shawn Popeleski.

{7} When they arrived at the cabin, Defendant, Mr. Wilkins, and Mr. Buckner joined Ben, Cassandra, Cassandra's two children, and Mr. Popeleski. Defendant drank beer and played with the children until Mr. Wilkins and Mr. Buckner took Defendant aside and divulged their plan to rob the others disguised with ski masks and wearing gloves. Defendant testified that he protested, but fear for his own life prevented him from refusing to cooperate. The three of them announced that they were leaving and left the immediate vicinity of the cabin only to hide in the car. While hiding in the car, Defendant, Mr. Wilkins and Mr. Buckner discussed the plan to rob Ben Jr. Defendant claims that he again objected to the plan at that time.

{8} Nevertheless, Defendant accompanied Mr. Wilkins and Mr. Buckner as the plan came to fruition. As the three crept back to the cabin, Defendant encountered Mr. Popeleski. With a shotgun given to him by Mr. Wilkins, Defendant held Mr. Popeleski's head to the ground, while Mr. Wilkins and Mr. Buckner continued into the cabin. Upon hearing seven to eight shots emanate from the cabin, Defendant fired the shotgun into the air and permitted Mr. Popeleski to escape. Mr. Popeleski's taped testimony from the preliminary hearings of Mr. Wilkins and Mr. Buckner corroborates this aspect of Defendant's testimony. Defendant also testified that the shots he heard indicated to him

that everyone in the cabin had been shot, including the children. He claimed that after releasing Mr. Popeleski, he too might have run away but he was in fear for his family. Instead, Defendant joined Mr. Wilkins and Mr. Buckner in the car.

{9} On the drive back to Albuquerque, Defendant testified that Mr. Wilkins and Mr. Buckner stopped to burn the gloves and masks in trash cans. Defendant testified that when Mr. Wilkins and Mr. Buckner returned to the car they laughed and rejoiced in the fact that they had left no witnesses. This apparently supported his belief that no one was left alive in the house. He also testified that he did not call the police because he feared for his life and for the lives of his family. Defendant claimed that he never planned to kill, rob, or otherwise hurt anyone, and reiterated that he did not know that the children were alive. During cross-examination, the State attacked Defendant's credibility based on the multiple contradictory accounts previously offered by him and insisted that Defendant's role in the murders was more significant than he indicated. The State theorized that Defendant's actions were deliberate and motivated by his desire to accommodate the 18th Street Gang, who had ordered a hit on Ben Jr.

{10} As part of its case in chief, the State called Detective Juan DeReyes of the Albuquerque Police Department's Metro Gang Unit to testify both as an investigating officer and as an expert on gangs. Overruling Defendant's objection, the trial judge qualified Detective DeReyes as an expert in gang subculture, but limited his testimony to matters such as specialized vocabulary, gang rituals and procedures, distinctive clothing, and gang symbolism. The judge further restricted Detective DeReyes from testifying to specific instances of Defendant's prior misconduct unless such evidence was gleaned from Defendant's own admissions.

{11} Detective DeReyes first defined the word "gang" and listed the criteria used by his unit to identify gangs. After identifying the 18th Street Gang as the largest gang in Albuquerque, Detective DeReyes testified that Defendant was one of its members. Detective DeReyes described the hierarchical structure of gangs, including the violent means of gang initiation and the procedures by which already initiated members rise in the ranks. When the witness began to suggest that the nature of the Torreón murders corresponded with typical gang "hits," the trial court terminated the testimony. The court refused, however, to grant Defendant's motions to declare a mistrial or to request that the jury set aside Detective DeReyes' testimony.

{12} Defendant was convicted of four counts of felony murder in the first degree, contrary to NMSA 1978, § 30–2–1(A)(2) (1994), armed robbery with a firearm enhancement, contrary to NMSA 1978, § 30–16–2 (1973), conspiracy to commit premeditated murder in the first degree, contrary to NMSA 1978, § 30–28–2 (1979), and one count of tampering with evidence, contrary to NMSA 1978, § 30–22–5 (1963). Defendant appeals his conviction on the following theories: (1) the jury instructions impermissibly allowed the jury to convict Defendant without finding that he acted with intent; (2) the trial court erred by denying Defendant's tendered jury instruction on mistake of fact; (3) the trial court erred by denying Defendant's tendered jury instruction on duress; (4) the court erroneously admitted Defendant's statements into evidence; (5) Detective DeReyes' testimony regarding gangs improperly allowed Defendant's convictions to be based on his association with the 18th Street Gang; (6) there was insufficient evidence to support the convictions for felony murder, armed robbery, conspiracy, and tampering with evidence; and (7) the trial court's errors, taken together constitute cumulative error.

## THE FELONY MURDER INSTRUCTION

■ {13} Felony murder consists of a second-degree murder committed in the course of a dangerous felony. Section 30–2–1(A)(2); see State v. Campos, 1996–NMSC–043, ¶ 17, 122 N.M. 148, 921 P.2d 1266. In New Mexico, and a handful of other states, the legislature has elected to treat this species of second-degree murder as murder in the first degree. Id.; see Greg Bailey, *Death by Automobile as First Degree Murder Utilizing the Felony Murder Rule*, 101 W. Va.

L.Rev. 235, 249 (1998) (naming Alabama, Arizona, Georgia, and Texas as the only other states that treat felony murder as first degree murder). The trial court submitted to the jury an unmodified Uniform Jury Instruction on second-degree murder, which allows for a verdict of guilt provided that, among other things, the State has proven beyond a reasonable doubt that "[t]he defendant intended the killing to occur or knew that he was helping to create a strong probability of death or great bodily harm." UJI 14–210 NMRA 2000. Defendant argues that by failing to accompany this instruction with a general criminal intent instruction, which requires a higher level of criminal intent, the trial court allowed Defendant to be convicted without adequate proof of the intent element of felony murder. *Cf. Campos*, 1996–NMSC–043, ¶ 38 (describing general criminal intent as including conscious wrongdoing and purposefulness, but not including mere knowledge).

{14} A general criminal intent instruction is not appropriate unless the legislature has failed to state the intent element of a particular crime. *See Campos*, 1996–NMSC–043, ¶ 34. As Defendant correctly observes, the intent elements of second degree and felony murder are synonymous. *See Campos*, 1996–NMSC–043, ¶ 29. The legislature has mandated that the intent element of second-degree murder is satisfied when the defendant acts with knowledge that his actions create a strong probability of death or great bodily harm to an individual:

> Unless he is acting upon sufficient provocation, upon a sudden quarrel or in the heat of passion, a person who kills another human being without lawful justification or excuse commits murder in the second degree if in performing the acts which cause the death he knows that such acts create a strong probability of death or great bodily harm to that individual or another.

NMSA 1978, § 30–2–1(B) (1991); *see State v. Varela*, 199–NMSC–045, ¶ 21, 128 N.M. 454, 993 P.2d 1280 (holding that evidence supported a finding that the defendant acted with the necessary mens rea for felony murder when "the jury could have found [the defendant] knew shooting into a mobile home, in which several people lived, created a strong probability of death or great bodily harm"). The jury instructions administered by the trial court accurately represented this element. Furthermore, because the legislature has articulated the intent element of second degree murder, and, by extension, felony murder, Defendant's requested general criminal intent instruction was inappropriate.

## MISTAKE OF FACT

{15} Defendant argues that the trial court's rejection of his tendered mistake of fact instruction constitutes reversible error. At trial, he sought the instruction to support his theory that his mistaken belief that the children had died at the same time as the other victims excused his failure to take action to save them from starvation. A defendant is entitled to have the jury instructed on his theory of the case if that theory is supported by the evidence. *State v. Bunce*, 116 N.M. 284, 287, 861 P.2d 965, 968 (1993). However, the trial court need not give a mistake of fact instruction "where the intent element of the crime is adequately defined by the other instructions given by the trial court." *Id.* As discussed above, we believe that the instruction requiring the State to prove that "[t]he defendant intended the killing to occur or knew that he was helping to create a strong probability of death or great bodily harm" adequately defined the intent element of felony murder. The question of whether or not Defendant made a significant mistake of fact is subsumed by this instruction; a jury finding that Defendant had made such a mistake would have negated the intent element. We therefore find no error in the trial court's refusal to submit Defendant's mistake of fact instruction to the jury.

## DURESS

{16} Based on a defendant's entitlement to have a jury instruction on his theory of the case read to the jury if it is supported by the evidence, Defendant also argues that the trial court's refusal to provide the jury with his requested duress instruction constitutes reversible error. He insists that his

testimony shows that he acted out of fear for his safety and the well-being of Mr. Popeleski and supports his theory that he was acting under duress. Defendant's proposed instruction reads, in relevant part:

> Evidence has been presented that the defendant was forced to help in the crimes charged under threats. If the defendant feared immediate great bodily harm to himself or another person if he did not help commit the crimes charged and if a reasonable person would have acted in the same way under the circumstances, you must find the defendant not guilty.

This instruction differs from the uniform jury instructions in that it substitutes "help in the crimes charged" for a blank space left open in the uniform jury instruction intended for a description of the acts constituting the specific offense. *See* UJI 14–5130 NMRA 2000. Defendant's instruction also substitutes "help commit the crimes" for "commit the crime." *Id.* Thus, Defendant's instruction attempts to establish a global duress instruction applicable to all crimes with which Defendant was charged, rather than enumerating, as UJI 14–5130 prescribes, each specific offense.

■ {17} A trial court's refusal to submit a jury instruction is not error if the submission of the instruction would mislead the jury by promoting a misstatement of the law. *See State v. Salazar,* 1997–NMSC–044, ¶ 57, 123 N.M. 778, 945 P.2d 996 (stating that "[i]t is not error for a trial court to refuse instructions which are inaccurate"); *see also State v. Lara,* 110 N.M. 507, 515, 797 P.2d 296, 304 (Ct.App.1990) (holding that in order to premise error on a refused instruction, the defendant must have tendered a legally correct statement of the law). Thus, a defendant has no right to have a legally incorrect jury instruction read to the jury. Here, Defendant was charged with an open count of murder, including willful, deliberate, and premeditated murder. As Defendant concedes, duress is not a defense to an intentional killing. *See* UJI 14–5131 NMRA 2000; *State v. Finnell,* 101 N.M. 732, 736–37, 688 P.2d 769, 773–74 (1984) (affirming trial court's refusal of defendant's duress instruction in a first degree murder case). Because Defendant's instruction applied to all crimes with which Defendant was charged, the instruction, if submitted to the jury, would have misstated the law by suggesting that duress was available as a defense to the charge of intentional murder. The trial court's refusal to give this instruction to the jury was therefore appropriate and not erroneous.

## ADMISSIBILITY OF THE DEFENDANT'S STATEMENTS

■ {18} Prior to trial, Defendant moved to suppress his May 11 statement as evidence obtained in violation of *Miranda v. Arizona,* and his May 13 and May 15 statements as fruits of the poisonous tree. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court ruled that the interview between Defendant and Detective DeReyes was non-custodial, and that *Miranda* therefore did not apply. On appeal, Defendant asserts that the trial court erred in finding the May 11 interview non-custodial. According to Defendant, the fact that the interview was conducted in a small office with the door closed, with Detective DeReyes blocking the path to the doorway, and with Defendant's back to the wall, leads to the conclusion that the interview was a custodial interrogation. Because no *Miranda* warnings preceded what he contends was a custodial interrogation, Defendant now asks that we reverse the trial court.

■ {19} In reviewing a trial court's denial of a motion to suppress, we observe the "distinction between factual determinations which are subject to a substantial evidence standard of review and application of law to the facts[,] which is subject to de novo review." *State v. Munoz,* 1998–NMSC–048, ¶ 39, 126 N.M. 535, 972 P.2d 847 (quoting *State v. Juarez,* 120 N.M. 499, 502, 903 P.2d 241, 244 (Ct.App.1995).) Determining whether or not a police interview constitutes a custodial interrogation requires the application of law to the facts. We therefore apply de novo review.

■ {20} A suspect's *Miranda* rights attach only when he is the subject of a "custodial interrogation." *Miranda,* 384 U.S. at 445, 86 S.Ct. 1602; *see State v. Juarez,* 120 N.M. 499, 502, 903 P.2d 241, 244

(Ct.App.1995). Thus, an officer's obligation to administer *Miranda* warnings arises only when there has been such a restriction on a person's freedom as to render him in custody. *Oregon v. Mathiason,* 429 U.S. 492, 494–95, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam). Custody is determined objectively, not from the subjective perception of any of the members to the interview. *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). The United States Supreme Court has held that whether or not an interview is custodial depends on whether there was a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* at 495, 114 S.Ct. 1526 (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam)); *see also Munoz,* 126 N.M. 535, 972 P.2d 847, 1998–NMSC–048, ¶ 40. In *Beheler,* the defendant agreed to accompany the police to the station house where he was questioned about a murder without the benefit of *Miranda* warnings. *Beheler,* 463 U.S. at 1122, 103 S.Ct. 3517. The Court refused to require *Miranda* warnings "simply because the questioning takes place in the station house." *Id.* at 1125, 103 S.Ct. 3517 (quoting *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711). The Court held that although the questioning occurred at the police station, the defendant's freedom "was not restricted in any way whatsoever." *Id.* at 1123. *Miranda* warnings were therefore unnecessary. *Id.* at 1126.

{21} Similarly, in *Munoz,* this Court questioned whether a defendant who had not received *Miranda* warnings prior to being interrogated was in custody. *Munoz,* 126 N.M. 535, 972 P.2d 847, 1998–NMSC–048, ¶¶ 39–44. We held that because there was no restraint on his freedom of movement, a one-hour-and-forty-minute interrogation conducted by FBI agents in the back of a police car was not a custodial interrogation. *Id.* at ¶ 43. In the present case, Defendant points to environmental aspects of the Detective's office to suggest that the arrest was custodial. However, the fact that the office was small, that Defendant's back was to the wall of the office, that an officer was situated between Defendant and the doorway, and that the door was closed do not, in and of

themselves, indicate a formal arrest or suggest that Defendant's freedom of movement was restricted to an extent consistent with a formal arrest. Rather, these facts, as well as the trial court's findings that Defendant was asked and agreed to accompany police officers to the station, was free to leave or terminate the interview, and was provided transportation to and from the station, are consistent with routine, non-custodial police questioning. We affirm the trial court's ruling that the May 11 interview was non-custodial, and that the police officers were not constitutionally compelled to recite *Miranda* warnings to Defendant prior to the questioning.

■ {22} Defendant also raises the related claim that, independent of the lack of *Miranda* warnings, his Fifth Amendment right to an attorney was violated when his explicit request to see an attorney was ignored. When an accused has invoked his right to have counsel present during a custodial interrogation he cannot be subject to further interrogation until counsel has been made available to him or he himself initiates further communication. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). As *Edwards* suggests, this right, like the general right to receive *Miranda* warnings, attaches only during custodial interrogations. Because the trial court correctly found that this interview was non-custodial, the investigating officer did not have a constitutional duty to refrain from questioning Defendant after Defendant requested an attorney.

**GANG AFFILIATION EVIDENCE**

■ {23} Defendant claims that Detective DeReyes' expert testimony regarding gang subculture contained evidence of association and bad acts. Without enumerating specific errors or citing rules of evidence, Defendant appears to raise two separate arguments: (1) Detective DeReyes' testimony constituted improper character evidence, and (2) the testimony was unfairly prejudicial. We review the admission of expert witness testimony for a showing that the trial court abused its discretion. *State v. Alberico,* 116

N.M. 156, 169–70, 861 P.2d 192, 205–06 (1993).

{24} Defendant argues that even if associating Defendant with the 18th Street Gang were admissible, "the bad acts of the gangs and of 18[th] Street were not." Defendant's brief fails to specify the source for the proposed inadmissibility, but we assume that by mentioning "bad acts," Defendant refers to inadmissible character evidence. Generally, "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Rule 11–404(B) NMRA 2000. Such evidence may, however, be offered to prove, "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *Id.*

{25} To be sure, evidence of gang affiliation could be used improperly as a backdoor means of introducing character evidence by associating the defendant with the gang and describing the gang's bad acts. As Rule 11–404(B) suggests, however, evidence of gang affiliation that might otherwise be inadmissible character evidence may be admissible to show other important elements of the crime. *See United States v. Robinson*, 978 F.2d 1554, 1563, (10th Cir.1992) (affirming admissibility of gang affiliation testimony and holding that "[gang] associational evidence may be directly relevant on the issues of formation, agreement and purpose of a conspiracy"); *State v. Mireles*, 119 N.M. 595, 597, 893 P.2d 491, 493 (Ct.App.1995) (affirming trial court's admission of evidence of a feud between two families where "prior violence between the two groups and Defendant's association with them provided a theory to jury with regard to why [victim's] death might have been intentional"). Detective DeReyes' testimony, both as to Defendant's affiliation with the 18th Street Gang and the specific rituals and procedures of that gang, was admissible to show Defendant's alleged motive (to rise up in the ranks of the gang by performing a hit on its behalf) and intent to murder the victims.

{26} Defendant also urges that evidence of Defendant's association with 18th Street Gang, and the bad acts of that particular gang, was unfairly prejudicial. Evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or if it confuses the issues or misleads the jury. Rule 11–403 NMRA 2000. Here, as evidence of Defendant's motive and intent, the testimony had considerable probative value. The fact that the trial court terminated the testimony when the questioning attempted to establish that the exact manner in which Ben was murdered was consistent with a gang execution suggests that the trial court was vigilant in its enforcement of Rule 11–403. In light of the probative value of this testimony, we hold that the trial court did not abuse its discretion by failing to terminate the testimony at an earlier time. *See State v. Coffin*, 1999–NMSC–038, ¶ 35, 128 N.M. 192, 991 P.2d 477 (holding that the trial court did not abuse its discretion by admitting testimony regarding the activities of the defendant's gang when gang involvement was part of the fabric of the case).

## SUFFICIENCY OF EVIDENCE

{27} Defendant contends that there was insufficient evidence to support any of his convictions. The test for sufficiency of evidence requires an appellate court to ensure that a "rational jury could have found beyond a reasonable doubt the essential facts required for a conviction." *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992). Such review involves a two-step process, consisting of "deference to the resolution of factual conflicts and inferences derived therefrom, and a legal determination of whether the evidence viewed in this manner could support the conviction." *State v. Orgain*, 115 N.M. 123, 126, 847 P.2d 1377, 1380 (Ct.App. 1993).

{28} Defendant states that "[t]he only substantial factual dispute relevant to [his] convictions was whether he in some manner encouraged, planned or participated in the killings." He suggests that there exists a general rule that New Mexico requires an overt act by the defendant in order to support an inference of aiding or abetting. He argues that there was insufficient evidence to support such an inference because he "did nothing to manifest his alleged in-

tent, nor anything physical act [sic] to encourage Wilkins or Buckner." *See* UJI 14–2821 NMSA 2000. According to his own testimony, Defendant accompanied Mr. Wilkins and Mr. Buckner to the cabin. He spent time with the victims in their cabin until participating in a feigned departure. He waited in the car with Mr. Wilkins and Mr. Buckner as they discussed the plan to rob the victims, then carried a loaded shotgun toward the cabin and held Mr. Popeleski to the ground with the barrel aimed at his head while Mr. Wilkins and Mr. Buckner shot and killed Ben and Cassandra, leaving two small children to starve to death. These actions could have supported an inference of an intent to encourage Mr. Wilkins and Mr. Buckner. We find no merit to Defendant's argument that the jury lacked sufficient evidence upon which to base an inference that Defendant aided or abetted the commission of felony murder.

{29} This same evidence relied upon by the jury to support the felony murder conviction also could have led the jury to find, beyond a reasonable doubt, the essential facts necessary to support Defendant's conviction for conspiracy to commit first degree murder. Defendant's suggestion that "there is no evidence that [he] knew, understood or conspired with Wilkins and Buckner to commit first degree murder" is contradicted by his own testimony that he incapacitated Mr. Popeleski while Mr. Wilkins and Mr. Buckner murdered and robbed the victims. Defendant's incapacitation of Mr. Popeleski could have also led the jury to find him guilty of armed robbery based on the theory of accomplice liability with which the jury was instructed. *See, e.g., State v. Carrasco,* 1997–NMSC–047, ¶¶ 10–19, 124 N.M. 64, 946 P.2d 1075.

{30} Finally, Defendant asserts that there was insufficient evidence to support his conviction for tampering with evidence. Defendant again ignores the fact that the jury was instructed on accomplice liability. Such liability may support a conviction for tampering with evidence. *See State v. Casteneda,* 97 N.M. 670, 679, 642 P.2d 1129, 1138 (Ct.App.1982). Here, evidence of Defendant's participation in the use and removal of the ski mask and shotgun from the scene of the crime, combined with the later destruction or disposal of these objects, could have led the jury to conclude that he was liable as an accomplice for tampering with evidence.

## CUMULATIVE ERROR

{31} Defendant claims that the proposed errors herein addressed, along with the trial court's refusal to change venue, amounts to cumulative error and requires reversal. *See State v. Woodward,* 121 N.M. 1, 10, 908 P.2d 231, 240 (1995). Since we have found no error in the trial court's disposition of this case, we find no merit to the cumulative error claim.

## CONCLUSION

{32} Defendant's convictions for felony murder, conspiracy to commit first degree murder, armed robbery with a firearm enhancement, and tampering with evidence are affirmed.

{33} **IT IS SO ORDERED.**

MINZNER, C.J., BACA, SERNA, and MAES, JJ., concur.