This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-38868**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**GALE EDWARD ELDRIDGE,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**Robert A. Aragon, District Judge**

Raúl Torres, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**BACA, Judge.**

**{1}** Having granted Defendant's motion for rehearing and considered the State's response, we withdraw the opinion filed September 21, 2023, and substitute the following in its place. Defendant entered into a conditional plea agreement wherein he pleaded guilty to criminal sexual contact of a minor in the third degree (child under 13), contrary to NMSA 1978, Section 30-9-13(C)(1) (2003), but reserved his right to appeal his motion to suppress and his motion to dismiss. On appeal, Defendant argues that (1) his Fifth Amendment rights were violated because the officers failed to read him his

*Miranda* warnings, (2) the officers coerced his incriminating statement, (3) the twenty-nine-month delay in resolving this case violated his right to a speedy trial, and (4) the district court erred in denying his speedy trial motion without holding an evidentiary hearing. *See Miranda v. Arizona*, 384 U.S 436 (1966). Concluding that the district court erred in failing to provide Defendant an evidentiary hearing on his speedy trial motion, we reverse and remand so that Defendant may have a hearing on this issue. Otherwise, we affirm.

**BACKGROUND**

**{2}** On July 18, 2017, Detective Andrew Gilbert called Gale Eldridge (Defendant) asking Defendant to come to the San Juan County Sherriff's Office to discuss his daughter's allegation that he had sexually assaulted her. Defendant agreed to be interviewed, but asked to be given a polygraph as part of the interview. Defendant drove himself to the Sheriff's Office. Upon arrival, Detective Gilbert escorted Defendant to an interrogation room, which was about a 10-foot by 10-foot room, accessible by a single door that had no windows apart from a one-way viewing window. The door to the interrogation room was left unlocked during the entire period that Defendant was in the room. When Defendant arrived in the interrogation room, Detective Gilbert informed him that he was free to leave at any time.

**{3}** Defendant was taken to a second interrogation room, where Captain Dowdy administered a polygraph test as well as a pre- and post-polygraph interview. At the outset of the polygraph test, Captain Dowdy told Defendant that he was not trying to add more charges. The polygraph examination and post-polygraph interview lasted approximately one hour and eight minutes.

**{4}** Following the post-polygraph interview with Captain Dowdy, Detective Gilbert re-entered the room. Defendant was then interrogated by Detective Gilbert, Captain Dowdy, and then again by Detective Gilbert, in tag-team fashion.[1] This interrogation lasted approximately two hours.

**{5}** At the beginning of the interrogation, Detective Gilbert positioned himself between Defendant and the door. Detective Gilbert admitted to having Defendant in the corner with his back against the wall. Though Defendant repeatedly denied the charges, Detective Gilbert told Defendant, "I don't know what to do to get you over the hump as far as being able to be honest and getting you out of this room and being done and moving on with life."

**{6}** After interrogating Defendant for some time, Detective Gilbert left the room again, and Captain Dowdy re-entered. Neither Captain Dowdy nor Detective Gilbert offered Defendant a break before they started another round of interrogation. Upon the commencement of this portion of the interrogation, Defendant said, "I'm tired. I want to go home. I'm tired." Captain Dowdy responded, "I know," and patted Defendant on his

---

[1]In this opinion we refer to Detective Gilbert and Captain Dowdy collectively as "the officers" or individually as "officer."

knee. Defendant again stated, "Guys, I want to go home. I'm done," to which Captain Dowdy said, "We can't stop you from walking out of here, and I think you know the ramifications if you do. We don't have your side of the story."

**{7}** When defense counsel asked Captain Dowdy if it would be reasonable for a person in Defendant's position to believe he was not free to leave when he asked numerous times and the officers did not let him go, Captain Dowdy responded that potentially a reasonable person might not think he was free to leave. At one point during the interrogation, Captain Dowdy placed his knees over Defendant's knees. As well, during the interrogation, Defendant was confronted with a letter allegedly written by his daughter and was told that the officers thought he did what she accused him of.

**{8}** Later, Detective Gilbert once again re-entered the room. He then stated, "I wouldn't keep you in a room talking about the same stuff if I didn't feel confident." By this point, Defendant had asked to leave twice.

**{9}** In response to a third request to leave, Detective Gilbert responded, "I can't stop you from walking out that door, but something happened. You walk out this door on your terms, you're the one that's going to make your bed, you've got to lie in it."

**{10}** At the end of the questioning, Defendant stated that on one occasion, when his daughter was twelve years old, she slept in his bed and when he woke up, his hand was rubbing her crotch, for maybe a "few minutes," while he had an erection.

**{11}** In total, Defendant was at the sheriff's office for approximately four and a half hours. Detective Gilbert never informed Defendant that he was not under arrest, and Defendant was never read his *Miranda* warnings.

**{12}** A hearing was held on Defendant's motion to suppress his statement to the officers. Following the hearing, the parties submitted proposed findings of fact and conclusions of law. On November 14, 2019, the district court issued its order on Defendant's motion to suppress statements. In its order, the district court made several findings of fact, chief among them that Defendant voluntarily spoke to the officers, voluntarily participated in a polygraph examination, Defendant was told by the officers at the start of and repeatedly throughout the interview that he was free to leave at any time, and Defendant was never restrained or denied permission to terminate the interview or leave.

**DISCUSSION**

**{13}** On appeal, Defendant advances four grounds for his appeal. He contends that (1) his Fifth Amendment Rights were violated because the officers failed to read his *Miranda* warnings; (2) the officers coerced his incriminating statement; (3) the twenty-nine-month delay in resolving this case violated his right to a speedy trial; and (4) the district court erred in denying his speedy trial motion without an evidentiary hearing. We address each of Defendant's arguments below.

## I.    Motion to Suppress

### A.    Standard of Review

**{14}**   "A ruling on a motion to suppress evidence presents a mixed question of law and fact. In reviewing a district court's rulings on a motion to suppress, we review factual findings under a substantial evidence standard, viewing the facts in the light most favorable to the prevailing party, and we review de novo whether the district court correctly applied the law to the facts. In addition, we indulge in all reasonable inferences in support of the district court's ruling and disregard all evidence and inferences to the contrary. Whether a defendant was subject to a custodial interrogation and whether a defendant's statement was voluntarily given are legal determinations that we review de novo on appeal." *State v. Olivas*, 2011-NMCA-030, ¶ 8, 149 N.M. 498, 252 P.3d 722 (alterations, internal quotation marks, and citations omitted).

### B.    Defendant Has Not Established That the District Court Erred by Denying His Motion to Suppress.

**{15}**   Defendant appeals the denial of his motion to suppress statements he made during a police interview contending that the police violated his Fifth Amendment rights. According to Defendant he was in custody during the interrogation and was therefore entitled to, but did not receive, *Miranda* warnings prior to being questioned.

**{16}**   To ensure that a person suspected of a crime is not compelled to make incriminating statements, the United States Supreme Court held in *Miranda* that a person "must be warned that [they have] a right to remain silent, that any statement [they do] make may be used as evidence against [them], and that [they have] a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444; *State v. Snell*, 2007-NMCA-113, ¶ 9, 142 N.M. 452, 166 P.3d 1106 (same).

**{17}**   *Miranda* warnings are required during custodial interrogation. *See State v. Nieto*, 2000-NMSC-031, ¶ 20, 129 N.M. 688, 12 P.3d 442. Thus, the obligation to administer *Miranda* warnings arises where there has been such a restriction on a person's freedom as to render them in custody. *See id.* If during custodial interrogation, *Miranda* warnings are not read, a suspect's statements cannot be used against them as substantive evidence at trial. *See Miranda*, 384 U.S. at 444; *Snell*, 2007-NMCA-113, ¶ 9.

**{18}**   Custody is determined objectively, and not from the subjective perception of any of the participants (Defendant or police) of the interrogation. *See Snell*, 2007-NMCA-113, ¶ 10. Whether an interrogation is custodial turns on whether there was a "formal arrest or restraint on freedom of movement to the degree associated with a formal arrest." *Nieto*, 2000-NMSC-031, ¶ 20 (internal quotation marks and citation omitted). A suspect is also in custody if a reasonable person would believe they were not free to leave. *See Snell*, 2007-NMCA-113, ¶ 10.

**{19}** This Court has held that important factors in the custody determination are "the purpose, place, and length of interrogation." *Id.* (internal quotation marks and citation omitted). Additional factors to consider are "the extent to which the defendant is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention, and the degree of pressure applied to the defendant." *Id.* (internal quotation marks and citation omitted).

**{20}** As to whether Defendant's statements to the officers were voluntary, "[t]he [State] has the burden of proving the voluntariness of a defendant's statement by a preponderance of the evidence." *See State v. Fekete*, 1995-NMSC-049, ¶ 34, 120 N.M. 290, 901 P.2d 708. "[T]he preponderance of the evidence must establish that the confession was not 'extracted from an accused through fear, coercion, hope of reward or other improper inducements.'" *State v. Cooper*, 1997-NMSC-058, ¶ 30, 124 N.M. 277, 949 P.2d 660 (quoting *State v. Turnbow*, 1960-NMSC-081, ¶ 41, 67 N.M. 241, 354 P.2d 533). "If the state fails to prove voluntariness by a preponderance of the evidence, the [district] court must rule that the confession was involuntary as a matter of law." *Aguilar v. State*, 1988-NMSC-004, ¶ 11, 106 N.M. 798, 751 P.2d 178.

**{21}** Preliminarily, we observe that the district court's order on Defendant's motion to suppress statements contained findings of fact that Defendant does not challenge in either his appeal or in his motion for rehearing, and which we adopt on appeal as supported by substantial evidence. *See* Rule 12-318(A)(4) NMRA ("The argument shall set forth a specific attack on any finding, or the finding shall be deemed conclusive."); *State ex rel. Foy v. Vanderbilt Cap. Advisors*, 2022-NMCA-026, ¶¶ 26, 27, 28, 511 P.3d 329.

**{22}** Based on these findings, which we discuss in our analysis below, the district court concluded that "Defendant was never in custody, [and] that his statements were given voluntarily" and denied the motion. Whether Defendant was in custody and whether his statements were voluntary are legal determinations that we review de novo. *See Vanderbilt Cap. Advisors*, 2022-NMCA-026, ¶¶ 26, 29 (reviewing legal arguments where the appellant did not challenge the district court's findings of fact); *Olivas*, 2011-NMCA-030, ¶ 8 ("Whether a defendant was subject to a custodial interrogation and whether a defendant's statement was voluntarily given are legal determinations that we review de novo on appeal.").

**{23}** On appeal, we presume that the district court has ruled correctly, and it is the burden of Defendant to show that the district court has erred. *See State v. Aragon*, 1999-NMCA-060, ¶ 10, 127 N.M. 393, 981 P.2d 1211 (explaining that "[t]here is a presumption of correctness in the district court's rulings. Accordingly, it is [the d]efendant's burden on appeal to demonstrate any claimed error below" (alterations, internal quotation marks, and citation omitted)).

**{24}** Here, Defendant contends that his statements to the officers should be suppressed because they were made while he was in their custody, and the officers did

not inform him of his *Miranda* rights. We conclude for the reasons set forth below that Defendant was not in custody.

**{25}** First, Defendant argues that he was in custody because certain statements the officers made would affect how a reasonable person would gauge the breadth of their freedom of action. The officers' statements were (1) that they did not believe Defendant's denials of his daughter's allegations; (2) that they were not trying to add more charges, which Defendant argues suggests that some were already pending; (3) "I know this is overwhelming for you . . . I don't want you to leave this room without . . . "; (4) "I don't pull people into a room just to screw with people"; and (5) "I wouldn't keep you in a room talking about the same stuff if I didn't feel confident." Moreover, Defendant contends that some of the officers' actions would cause a reasonable person to believe they were not free to leave. First, Defendant said he wanted to go home three times and was not escorted out until the fourth time, following his inculpatory statement. Second, Defendant informed the officers that he had sciatica and repeatedly announced that he was tired. Finally, the officers presented Defendant with a letter allegedly written by his daughter and told him they thought he did what she had accused him of.

**{26}** Defendant appears to assert that these statements and actions would lead a reasonable person to believe they were under arrest or not free to leave because charges were pending. However, the district court made the following findings of fact: (1) Defendant voluntarily submitted to an interview with San Juan County Detective Gilbert and others at the San Juan County Sheriff's Office; (2) Defendant was told that he was free to leave at any time at the commencement of the interview and repeatedly throughout; (3) Defendant announced that he was tired and ready to go home and then continued to give a statement; (4) Defendant announced his intent to "walk out of here" and was told by the investigator "We can't stop you from walking out of here"; (5) Defendant then asked, "What do I need to do?" and resumed responding to the investigator's questions; (6) when Defendant ultimately decided to conclude the interview, no effort was made to restrain or deter him; and (7) Defendant was never restrained or denied permission to terminate the interview or leave the room in which the encounter took place. Considering these facts, we find that a reasonable person would understand that they were not under formal arrest and that their freedom of movement was not being restrained to the degree associated therewith, but that instead they were free to leave or terminate the interview at any time. *See State v. Munoz*, 1998-NMSC-048, ¶ 43, 126 N.M. 535, 972 P.2d 847 (holding that the defendant's freedom of movement was not restrained in any way that could be associated with a formal arrest in part because the agents told the defendant he did not have to talk to them, that he could leave at any time, they did not handcuff him, and they did not prevent him from leaving).

**{27}** Second, Defendant submits that he was in custody because the polygraph examination and questioning combined lasted approximately four and a half hours. The parties dispute how much of that time should count towards the custody analysis, since a portion was spent conducting the polygraph examination. We note at the outset that four and a half hours is a long time to be questioned, even if part of that time was

attributable to the polygraph examination. However, "the ultimate inquiry is whether there was a restraint on freedom of movement of the degree associated with a formal arrest." *Snell*, 2007-NMCA-113, ¶ 10 (internal quotation marks and citation omitted). Here, in addition to the findings noted above, the district court found that Defendant voluntarily submitted to both the interview and the polygraph examination. Thus, while the length of the interrogation may weigh in favor of finding that Defendant was in custody, based on the district court's findings it was objectively clear that Defendant could have terminated the interview at any point during those four and a half hours. *See id.* ("Some of the *factors* relevant to whether a reasonable person would believe [they were] free to leave include the purpose, place, and length of interrogation." (emphasis added) (internal quotations marks and citation omitted)); *see also State v. Wilson*, 2011-NMSC-001, ¶¶ 47, 49, 149 N.M. 273, 248 P.3d 315, (holding that an interview lasting between two and three hours did not implicate *Miranda* and the defendant's freedom of movement was not restrained, in part because he voluntarily went to the police station and was told he was free to leave at any point), *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37, 275 P.3d 110.

**{28}**    Third, Defendant argues that he was in custody because he was interviewed in the corner of the room, with the officer situated between himself and the door, and that the officer crowded him in the corner, at one point placing his knees over Defendant's. As to the fact that Defendant was in the corner of the room, with the interviewing officer between himself and the door, our New Mexico Supreme Court addressed a similar situation in *Nieto*, where it held:

> [T]he fact that the office was small, that [the d]efendant's back was to the wall of the office, that an officer was situated between [the d]efendant and the doorway, and that the door was closed do not, in and of themselves, indicate a formal arrest or suggest that [the d]efendant's freedom of movement was restricted to an extent consistent with a formal arrest. Rather, these facts, as well as the [district] court's findings that [the d]efendant was asked and agreed to accompany police officers to the station [and] was free to leave or terminate the interview . . . are consistent with routine, non[]custodial police questioning.

2000-NMSC-031, ¶ 21. As to Defendant's contention that he was in custody because the officer crowded him in the corner and at one point had his knees over Defendant's, we find that this fact does weigh in favor of a finding that Defendant's freedom of movement was restrained. However, as noted Defendant (1) voluntarily submitted to the interview, (2) was told at the outset and repeatedly throughout that he was free to leave at any time, (3) announced his intention to walk out and was told he could not be stopped, and (4) was not stopped when he ultimately decided to conclude the interview. Therefore, the fact that an officer at one point placed his knees over Defendant's did not, in light of the whole interview and in this particular case, restrain his freedom of movement in a manner associated with a formal arrest.

**{29}** Finally, Defendant notes other environmental factors present during the interview in light of which Defendant contends the district court erred by concluding that the interview was non-custodial. Those factors are (1) that Detective Gilbert, among other officers, was armed; **(**2) that although the interview room was not locked, it was beyond at least one other locked door; (3) that Detective Gilbert used a raised tone of voice and yelled at Defendant; and (4) that recording equipment was used, adding to the formality of the interview. We turn now to these arguments.

**{30}** The fact that the interviewing detective among other officers was armed is not unexpected where, as here, Defendant agreed to be interviewed at the sheriff's office. This is particularly so where there is no allegation that, nor does the record reveal evidence of, the officers displaying the gun or using it against Defendant. Similarly, that the interview room was not locked, but was located behind at least one locked door, is consistent with routine, non-custodial police questioning, especially considering the officers' repeated statements that Defendant was free to leave at any time. *See id.* (holding that the fact that the door to the office was closed did not indicate that the defendant's freedom of movement was restricted to an extent consistent with formal arrest, but that it was instead consistent with routine, non-custodial police questioning considering that Defendant agreed to accompany the officers to the station and was free to leave or terminate the interview at any time). As well, the fact that officers raised their voice at Defendant is part of the routine interview of someone suspected of a crime by a police officer. *See Munoz*, 1998-NMSC-048, ¶¶ 8, 43-44 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)) (noting in the factual background section the defendant's allegation that the agent raised his voice but not factoring it into the custody analysis, and holding that where the defendant voluntarily went to the police station, was informed that he could leave at any time, was not handcuffed, and left without hindrance, the defendant's freedom of movement was not restrained in any way associated with a formal arrest, and "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime"). Finally, it is also consistent with routine, non-custodial police questioning at the sheriff's office to record the interview. *See Wilson*, 2011-NMSC-001, ¶¶ 47, 49 (holding that despite the presence of recording equipment, the interview did not implicate *Miranda*). Consequently, Defendant has not persuaded us that this conclusion was erroneous in light of the unchallenged factual findings and our de novo review. In the absence of a custodial interrogation, the officers were not obligated to inform Defendant of his *Miranda* rights. *See Nieto*, 2000-NMSC-031, ¶ 20 (stating that "[a] suspect's *Miranda* rights attach only when [they are] the subject of a custodial interrogation." (internal quotation marks and citation omitted)).

**{31}** Next, we turn to Defendant's contention that the officers coerced his statements from him. In determining the voluntariness of a confession, we follow a three-phase analysis laid out by the United States Supreme Court in *Culombe v. Connecticut*, 367 U.S. 568, 603 (1961). *Aguilar*, 1988-NMSC-004, ¶ 10. In the first phase, we address the totality of the circumstances surrounding procurement of the confession. *Id.* The second and third phases involve an inferential determination of the accused's reaction to those

external facts and the application of the due process standards to the court's perception of that reaction. *Id.*

**{32}** Defendant argues that the officers spoke of "ramifications" and "help," and that these statements amounted to threats and promises. **[BIC 20]** "Many cases have noted that threats and promises may rise to the level of coercive behavior by police." *State v. Evans*, 2009-NMSC-027, ¶ 42, 146 N.M. 319, 210 P.3d 216. We first discuss Defendant's contention that the officers' statements amounted to promises.

**{33}** Defendant argues that two of the officers' statements (1) "We're going to go before a judge or an attorney"; and (2) "That's why we are allowed to help you," taken together, could be interpreted as promises. Defendant asserts that these statements led him to believe the officers would go before a judge with him.

**{34}** "[A]n express promise of leniency renders a confession involuntary as a matter of law." *State v. Lobato*, 2006-NMCA-051, ¶ 19, 139 N.M. 431, 134 P.3d 122 (internal quotation marks and citation omitted). However, an implied promise is only one factor considered in the totality of the circumstances. *Id.*

**{35}** The statements in this case are certainly not express promises of leniency, and we doubt they even rise to the level of an implied promise of leniency. *See id.* ¶¶ 17-18, 20 (holding that where the officer stated, "I'll get you that help," in reference to treatment, "[w]e doubt that [the statements] even rise to the level of implied promises of leniency" because the defendant did not cite any point in the interview where the officer promised a lesser sentence for a confession); *Munoz*, 1998-NMSC-048, ¶ 34 ("The test in [the case of an implied promise] is whether the accused could reasonably have inferred a promise going to the punishment for the crime to be confessed." (internal quotation marks and citation omitted)). We hold that the officers' statements do not contribute materially to a showing that Defendant's confession was involuntary. *See Lobato*, 2006-NMCA-051, ¶¶ 17-18, 20.

**{36}** We move now to conduct an inferential determination of the accused's reaction to the external circumstances, and the application of due process standards to our perception of that reaction. *Aguilar*, 1988-NMSC-004, ¶ 10. Here, Defendant argues that he had no experience in court, that Detective Gilbert knew Defendant's father had been abusive, and that he raised his voice toward the end of the interview to create a level of discomfort. While heightened apprehensions are a factor weighing in favor of a finding that Defendant's statements were involuntary if the officers should have known of them, *see Munoz*, 1998-NMSC-048, ¶¶ 26, 37, under the totality of the circumstances, we find that Defendant was not coerced. *See Fekete*, 1995-NMSC-049, ¶ 35 ("[U]nder the totality of the circumstances test, a confession is not involuntary solely because of a defendant's mental state. Instead, the totality of circumstances test includes an element of police overreaching."). Moreover, as to Defendant's mental state, we find that he was mentally capable of determining that the officers' statements did not amount to promises.

**{37}** Defendant was a thirty-eight-year old optician, and it is not alleged, nor does our review of the record show, that he was of subnormal intelligence or that he had a mental illness. *Compare Munoz*, 1998-NMSC-048, ¶ 37 (holding that the defendant's mental state, age, and education weighed in favor of voluntariness), *with Aguilar*, 1988-NMSC-004, ¶¶ 12, 14 (holding that because the defendant was of subnormal intelligence and had a mental illness, he "unquestionably had difficulty in appreciating the meaning of the assurances given to him . . . and in distinguishing whether a deal had been made"). Moreover, the test in a case of an implied promise is "whether the accused could reasonably have inferred a promise going to the punishment for the crime to be confessed." *Munoz*, 1998-NMSC-048, ¶ 34 (internal quotation marks and citation omitted). Despite Defendant's inexperience with the court and his particular sensitivity to elevated volumes of speech, from the officers' vague statements we cannot say that Defendant's "will was overborne and his capacity for self-determination critically impaired." *See Lobato*, 2006-NMCA-051, ¶ 21 (alteration, internal quotation marks, and citation omitted); *id.* ("Despite . . . the officer's suggestion that he should confess in order to get treatment, we cannot say that [the d]efendant's will was overborne and his capacity for self-determination critically impaired." (alteration, internal quotation marks, and citation omitted)). We turn now to assess Defendant's assertion that the officers' statements amounted to threats.

**{38}** The critical difference between coercive threats and threats not crossing the line is "how credible and immediate the accused perceives the threat to be." *Evans*, 2009-NMSC-027, ¶ 43. On one hand, threats that an accused may perceive as real are impermissibly coercive. *Id.* On the other, threats merely highlighting potentially real consequences, or which are "adjurations to tell the truth," are not impermissibly coercive. *Id.*

**{39}** Three of the officers' statements could be taken as threats: (1) "We can't stop you from walking out of here, and I think you know the ramifications if you do. We don't have your side of the story"; (2) "I can't stop you from walking out that door, but something happened. You walk out this door on your terms, you're the one that's going to make your bed, you've got to lie in it"; and (3) "If you need to face your day in court in this, we're going to have to go in front of a judge or an attorney or whoever and say, 'look, he made a mistake,' or 'he's a predator that intentionally seeks out young girls of a certain age to gratify his sexual desires'."

**{40}** Our New Mexico Supreme Court decided a similar case in *Evans*, 2009-NMSC-027. In *Evans*, the agent said during the interview, "[T]hey're gonna hammer you . . . you're through . . . and you're gonna be treated like a monster in court and you're never gonna get out of prison." *Id.* ¶ 44. The Court found that taken in context of the entire interrogation, the agent appeared to be telling the defendant that unless he confessed and explained himself, he would be unable to explain himself to the jury. *Id.* ¶ 45. Similarly, here this appears to be what the officers were telling Defendant. By the statements, "We can't stop you from walking out of here, and I think you know the ramifications if you do. We don't have your side of the story," and "We're going to have to go in front of a judge or an attorney and say 'look, he made a mistake,' or 'he's a

predator that intentionally seeks out young girls of a certain age to gratify his sexual desires,'" the officer appeared to be telling Defendant that unless he confessed and explained himself, he would be unable to explain himself to the jury. Moreover, by the statement, "I can't stop you from walking out that door, but something happened. You walk out this door on your terms, you're the one that's going to make your bed. You've got to lie in it," the officer appeared to be warning of the real possibility that Defendant may be convicted.

**{41}** As in *Evans*, Defendant might have another chance to explain himself at trial, should he choose to testify. *See id.* Telling the officers the truth, however, even if Defendant did not ultimately decide to testify, would accomplish the same goal. *See id.* Like in *Evans*, the officers' statements "constitute[d] half-truths–a reasonable expression of opinion about consequences to Defendant if he did not talk, but an exaggeration when it came to telling Defendant that the interrogation with police was his best chance to talk." *See id.* Moreover, from our review of the record, Defendant was a thirty-eight-year old optician with an adult capacity to sort exaggerated tough talk from real threats. *See id.* ¶ 46 (holding that the line separating deception from coercion was not crossed because "[the d]efendant was a [thirty]-year-old man," who had "an adult capacity to sort exaggerated tough talk from real threats"). We hold that the officers' statements here did not cross the line into coercion.

**{42}** The district court found that (1) Defendant announced that he was tired and ready to go home and then continued to give a statement; (2) at another point, Defendant announced his intent to "walk out of here" and was told by the investigator "we can't stop you from walking out of here"; (3) Defendant then asked, "What do I need to do?" and resumed responding to the questions of the investigator; and (4) Defendant made statements to the officers during the interview. Based on these findings, the district court concluded that Defendant's "statements were given voluntarily." Consequently, Defendant has not persuaded us that this conclusion was erroneous in light of the unchallenged factual findings and our independent review.

**{43}** Because Defendant has not carried his burden of establishing that the district court erred by denying his motion to suppress, we affirm the district court's ruling. We next analyze whether the district court erred by failing to provide Defendant a hearing upon his motion to dismiss for a speedy trial violation.

## II. Defendant Was Entitled to a Hearing on His Motion to Dismiss

**{44}** Defendant contends that the failure of the district court to provide him with an evidentiary hearing at which he could present evidence and testimony in support of his motion deprived him of due process. We agree and explain.

**{45}** We review de novo claims involving the denial of procedural due process. *See State v. Worley*, 2020-NMSC-021, ¶ 16, 476 P.3d 1212 (stating "'[c]laims involving the denial of procedural due process are legal questions that this Court reviews de novo.'" (alterations omitted) (quoting *Miller v. Tafoya*, 2003-NMSC-025, ¶ 9, 134 N.M. 335, 76

P.3d 1092). The Due Process Clause protects against the "depriv[ation] of life, liberty, or property, without due process of law." U.S. Const. amend. V; *See* U.S. Const. amend XIV, § 1 (same); *see also* N.M. Const. art. II, § 18 ("No person shall be deprived of life, liberty or property without due process of law."). The Due Process Clause has been interpreted to protect individuals against substantive and procedural due process violations. *State v. Druktenis*, 2004-NMCA-032, ¶ 46, 135 N.M. 223, 86 P.3d 1050 (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987)).

**{46}** "Procedural due process requires the government to give notice and an opportunity to be heard before depriving an individual of liberty or property." *Titus v. City of Albuquerque*, 2011-NMCA-038, ¶ 40, 149 N.M. 556, 252 P.3d 780 (internal quotation marks and citation omitted). Procedural due process specifically requires that "a person be accorded an opportunity to be heard at a meaningful time and in a meaningful manner." *State ex rel. Child., Youth & Fams. Dep't v. Ruth Anne E*., 1999-NMCA-035, ¶ 17, 126 N.M. 670, 974 P.2d 164 (internal quotation marks and citation omitted). "The opportunity to be heard in a 'meaningful manner,' generally includes an opportunity to review and present evidence, confront and cross[-]examine witnesses, and consult with counsel, either by way of an informal or formal hearing." *State ex rel. Child., Youth & Fams. Dep't v. Maria C*., 2004-NMCA-083, ¶ 26, 136 N.M. 53, 94 P.3d 796.

**{47}** Because this is a criminal case where Defendant may be imprisoned, we are dealing with a deprivation of Defendant's liberty. Therefore, we will proceed to determine whether Defendant was denied due process when the district court did not hold an evidentiary hearing on his motion to dismiss for speedy trial violation.

**{48}** We begin, by reviewing the right to speedy trial and what a defendant must prove in bringing a successful challenge to a prosecution for violation of his right to speedy trial. We will then review the pertinent facts and circumstances of this case. Finally, we will determine if the district court erred by not providing Defendant an evidentiary hearing on his motion to dismiss.

**{49}** Both the Sixth Amendment of the United States Constitution and Article II, § 14 of the New Mexico Constitution guarantee an accused the right to a speedy trial. U.S. Const. amend. VI; N.M. Const. art. II, § 14. The right to a speedy trial "escapes precise definition" and is "amorphous, slippery, and necessarily relative." *State v. Spearman*, 2012-NMSC-023, ¶ 16, 283 P.3d 272 (internal quotation marks and citation omitted). As such, any determination of whether the right to a speedy trial has been violated requires an analysis of the particular facts and circumstances of the case. *Id.*

**{50}** In *Barker v. Wingo*, 407 U.S. 514, 530, (1972), the United States Supreme Court provided four factors for consideration: (1) length of delay, (2) reason for delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant. *Spearman*, 2012-NMSC-023, ¶ 17. Each of the factors is weighed either in favor of or against the defendant or the state, and then balanced to decide if a defendant's speedy trial right was violated. *See id.* None of the factors have talismanic qualities, nor are any of them a necessary or sufficient condition to a finding that a defendant's right to speedy trial

was violated. *Id.* ¶ 18. Rather, the factors must be considered together with other relevant circumstances. *Id.* "Before applying this balancing test, we first assess whether the length of the delay was 'presumptively prejudicial,' depending on the complexity of the case." *State v. Montoya*, 2015-NMCA-056, ¶ 11, 348 P.3d 1057. "[A] 'presumptively prejudicial' length of delay is simply a triggering mechanism, requiring further inquiry into the *Barker* factors." *State v. Garza*, 2009-NMSC-038, ¶ 21, 146 N.M. 499, 212 P.3d 387. "A delay of trial of one year is presumptively prejudicial in simple cases, fifteen months in intermediate cases, and eighteen months in complex cases." *Spearman*, 2012-NMSC-023, ¶ 21. Finally, the court defers to the district court's factual findings but reviews the balancing of the *Barker* factors de novo." *Id.* ¶ 19. The "accused does not need to be incarcerated to suffer some of the same hardships and prejudice the right to a speedy trial was meant to prevent." *Id.* ¶ 37.

**{51}** On December 4, 2019, Defendant filed his motion to dismiss for speedy trial violation (the Motion). In the title of the Motion Defendant included a "request for immediate evidentiary hearing." On December 5, 2019, the State filed its response. Defendant filed his reply to the State's response on December 13, 2019. In his reply, Defendant renewed his demand for an evidentiary hearing "to present the prejudice he has experienced as a result of the delay." On December 23, 2019, the district court issued its order denying the Motion (the Order). The district court issued the Order without holding an evidentiary hearing.

**{52}** Defendant argues that there was a twenty-nine-month delay in his case and that this delay violated his right to a speedy trial. The district court agreed that the delay was twenty-nine months and also found that the case was a complex case. Defendant contends that the case was simple or at most an intermediate case. The State, on the other hand, contends that substantial evidence supports the district court's finding that this was a complex case, given that Defendant named forty-seven witnesses, including three experts and reserved four days for trial.

**{53}** On questions concerning the complexity of a case for speedy trial analysis, "[w]e defer to the district court's finding on the question of complexity when it is supported by substantial evidence since the 'trial court is familiar with the factual circumstances, the contested issues and available evidence, the local judicial machinery, and reasonable expectations for the discharge of law enforcement and prosecutorial responsibilities.'" *State v. Laney*, 2003-NMCA-144, ¶ 11, 134 N.M. 648, 81 P.3d 591 (alteration omitted) (quoting *State v. Manzanares*, 1996-NMSC-028, ¶ 9, 121 N.M. 798, 918 P.2d 714). In this instance, due to the number of witnesses, including experts, and the number of days reserved for trial, we agree with the district court's determination that this case is a complex case. We observe, however, that the twenty-nine-month delay in this case far exceeds the threshold for the presumption of prejudice for speedy trial analysis whether the case is designated simple, intermediate, or complex. *See Spearman*, 2012-NMSC-023, ¶ 21. Therefore, there was a presumption of prejudice against Defendant because this complex case was older than eighteen months, which is the threshold for presumptive prejudice for a complex case. *See id.*

**{54}** We note that "[w]hen weighing the length of delay, we consider the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Id.* ¶ 23 (internal quotation marks and citation omitted). "The weight we assign this factor is proportional to the length of the delay—'as the delay lengthens, it weighs increasingly in favor of the accused.'" *State v. Deans*, 2019-NMCA-015, ¶ 6, 435 P.3d 1280 (alteration omitted) (quoting *State v. Ochoa*, 2017-NMSC-031, ¶ 14, 406 P.3d 505). In this case the delay was eleven months past the threshold for a complex case. Consequently, the district court decided Defendant's motion to dismiss without a hearing even though, under speedy trial analysis, there was a presumption of prejudice.

**{55}** Because we begin from a point of presumed prejudice, where Defendant argues that he was prevented from showing that he was prejudiced by the delay in his prosecution due to the district court's denial of an evidentiary hearing and because "[t]he heart of the right to a speedy trial is preventing prejudice to the accused," *see Garza*, 2009-NMSC-038, ¶ 12, we will primarily focus on this factor in determining if Defendant was entitled to an evidentiary hearing.

**{56}** "Ordinarily, a defendant bears the burden of proof on this factor by showing 'particularized prejudice' when claiming a speedy trial violation." *State v. Serros*, 2016-NMSC-008, ¶ 86, 366 P.3d 1121. The right to speedy trial protects three interests. *Spearman*, 2012-NMSC-023, ¶ 34. First, the right to speedy trial prevents oppressive pretrial incarceration. *Id.* Both parties agree the first interest is not at issue since Defendant was not incarcerated while the case was pending. Second, the right to speedy trial minimizes the anxiety and concern of the accused. *Id.* Finally, the right to a speedy trial limits the possibility that the defense will be impaired. *Id.*

**{57}** In this case Defendant claims to have suffered prejudice because of the twenty-nine-month delay in bringing him to trial. First, he alleges he has suffered severe anxiety, concern, and societal discrimination due to the nature of the charges against him. As evidence, Defendant states that he has lost his position as a pastor at his church and his employment situation suffered. Second, Defendant argues that "key witnesses have either disappeared or lost memory of key times, places and events related to the allegations and potential alibis in this matter." Third, Defendant argues that the victim herself now claims to have lost her memory about the events. Lastly, because of the length of delay in bringing this matter to trial, Defendant argues that he is now unable to prepare an adequate defense.

**{58}** The State responds that "Defendant's claims were not supported by affidavit or any other actual evidence" and that he made no showing that any alleged prejudice that occurred was a result of the delay and not the prejudice that arose from the indictment itself. If Defendant's assertions of prejudice are true, he undeniably suffered some prejudice as a result of the pending charges against him. However, we are unable to determine from the record before us if any of the prejudice Defendant asserts, resulted from the delay in this case. And although Defendant bears the burden of demonstrating particularized prejudice resulting from the delay, the district court's decision not to hold

an evidentiary hearing, prevented Defendant from presenting live testimony and perhaps other evidence in support of his speedy trial motion.2 Which, in turn, denied Defendant of several of the elements that we recognized as essential to due process in *Titus*, 2011-NMCA-038, including: an opportunity to make an oral presentation to the decision-maker; an opportunity to present evidence or witnesses to the decision-maker; a chance to confront and cross-examine the adversarial witnesses or evidence. *See id.* ¶ 42. "As it stands, however, there is simply no evidence in the record from which the district court, let alone this Court, can make a determination as to whether or not Defendant was prejudiced by the delay in bringing this matter to trial." *See Spearman*, 2012-NMSC-023, ¶ 39.

**{59}** We, therefore, conclude that the failure to provide Defendant an evidentiary hearing on his motion to dismiss violated Defendant's right to due process.

**{60}** Accordingly, an evidentiary hearing allowing Defendant a meaningful opportunity to be heard is necessary; therefore, we reverse and remand with direction that the district court hold an evidentiary hearing on Defendant's motion to dismiss for speedy trial violations. Because we reverse on this issue we do not address the denial of Defendant's motion to dismiss for speedy trial violations.

**CONCLUSION**

**{61}** For the reasons set forth above, we reverse and remand for a hearing on Defendant's speedy trial motion and affirm the district court's denial of Defendant's motion to suppress.

**{62}   IT IS SO ORDERED.**

**GERALD E. BACA, Judge**

**WE CONCUR:**

**JACQUELINE R. MEDINA, Judge**

**ZACHARY A. IVES, Judge**

---

2To the extent *State v. Urban*, 1989-NMCA-053, ¶ 15, 108 N.M. 744, 779 P.2d 121 applies to the situation before us, we conclude that, under the facts and circumstances of this case where (1) there was a twenty-nine-month delay in resolving the case; (2) prejudice was presumed because the delay was beyond the eighteen-month threshold for the presumption of prejudice in a complex case; (3) the delay was eleven months past the threshold for the presumption of prejudice; and (4) Defendant was claiming particularized prejudice as a result of the delay ("[K]ey witnesses have either disappeared or lost memory of key times, places and events related to the allegations and potential alibis in this matter."), it was error for the district court to decide that a hearing was not necessary and to decide the motion without the benefit of a hearing to determine if there was evidence to support Defendant's claims.